**EXHIBIT B**

IN THE MATTER OF THE EUROPEAN DEVELOPMENT FUND RULES

AND IN THE MATTER OF AN ARBITRATION

BETWEEN

**Stirling Civil Engineering Limited**
*(Claimant by substitution for Impresa Ing. Fortunato Federici SpA[1])*

**Claimant**

**and**

**Government of the United Republic of Tanzania**

**Respondent**

# Second ~~Corrected~~ Partial Award
# (Final save as to costs
# and interest)
### (10 June 2009)

This document is the Award of an arbitral tribunal consisting of:

| *President (Chairman):* | *Co-Arbitrator:* | *Co-Arbitrator:* |
|---|---|---|
| *Mr Anthony Bingham* | *Mr Louis Flannery* | *Mr Kesogukewele M.I. M. Msita* |
| *3 Paper Buildings* | *Stephenson Harwood* | *P.O. Box 70039* |
| *London EC4Y 7EU* | *One St Paul's Churchyard* | *Dar es Salaam* |
| *United Kingdom* | *London EC4M 8SH* | *Tanzania* |
| | *United Kingdom* | |

The Award concerns a dispute between the above-named parties.

| **The Claimant is represented by:** | **The Respondent is represented by:** |
|---|---|
| *Kesaria & Co,* | *Mkono & Co,* |
| *Advocates* | *Advocates* |
| *P.O. Box 729* | *P.O. Box 4369* |
| *Dar es Salaam, Tanzania* | *Dar es Salaam, Tanzania* |
| | |
| *Tel: +255 22 2113647 / 2113331* | *Tel: +255 22 211 8789 / 211 8790* |
| *Fax: +255 22 2118460* | *Fax: +255 22 211 3247 / 211 6635* |
| | |
| *dilip@kesarialaw.co.tz* | *nimrod.mkono@mkono.com* |

---

[1]      For the circumstances leading to the substitution of Stirling Civil Engineering Ltd ("SCEL") as Claimant, see the Partial Award dated 28th October 2005.

- 1 -

# *Legend*

| | | |
|---|---|---|
| *COWI* | = | *COWI Consulting Engineers and Planners (Supervisor's representative)* |
| *Defence* | = | *Statement of Defence* |
| *EDF* | = | *European Development Fund* |
| *EDF Rules* | = | *Procedural Rules on Conciliation and Arbitration of Contracts Financed by the European Development Fund (VIII/E/440/90-EN)* |
| *G&T Report* | = | *Report on Quantum dated February 2006 and prepared by J McSheaffrey of Gardiner & Theobald Fairway* |
| *Gibb Report* | = | *Revised Final Report dated June 2003 (Vols 1 and 2)* |
| *Government* | = | *Government of the United Republic of Tanzania (Respondent)* |
| *IFF* | = | *Impresa Ing Fortunato Federici SpA (in liquidation in Italy)* |
| *MoW* | = | *Ministry of Works* |
| *NoA* | = | *Notice of Arbitration* |
| *Partial Award* | = | *Partial Award dated 28th October 2005* |
| *SCEL* | = | *Stirling Civil Engineering Ltd (Claimant)* |
| *SoC* | = | *Statement of Claim* |
| *Scott Schedule* | = | *Scott Schedule of issues served by the parties [2]* |

---

[2]   See section 1 below at para 1.34 *et. seq.*

### *Section 1:        Introduction*

*The parties*

1.1    The Claimant in these proceedings (by substitution) is Stirling Civil Engineering Ltd ("SCEL"), a company incorporated in England and Wales.[3] The Respondent is the Government of the United Republic of Tanzania, acting through the Ministry of Works ("MoW").

*The Contract*

1.2    The dispute between the parties arises out of a contract for the rehabilitation of a 43km stretch of road between Dar es Salaam (Wazo Hill) and Bagamoyo, in Tanzania ("the Contract"). The Contract is evidenced by a "Works Contract Agreement" no. 10050/98/99, dated 7th May 1999.

1.3    The Works Contract Agreement was in five volumes:

(i)     Volume I is entitled "Main Agreement", and contains various documents, including a two-page signed "Agreement" (dated 7th May 1999), a Memorandum of Understanding, a Letter of Intent, selected documents from the Tender and the Minutes of Pre-Tender Meeting.

(ii)    Volume II consists of the Tender (in two parts).

(iii)   Volume III contains the Conditions of Contract, including the Special Conditions of Contract[4] ("the Special Conditions"), the General Conditions of Contract[5] ("the General Conditions"), various Appendices[6] and the EDF Rules[7].

(iv)    Volume 4 contains the Technical Specifications.

(v)     Volume 5 contains the Drawings.

---

[3]    The substitution of SCEL as Claimant in place of IFF was given effect by the Partial Award dated 28th October 2005.

[4]    Volume III, Section H.

[5]    Volume III, Section I ("General Conditions for Works Contracts Financed by the [EDF]").

[6]    The Appendices are listed in the Table of Contents in Volume III of the Agreement, under Section J.

[7]    Volume III, Section K.

1.4     The two-page signed Agreement[8] states that the Contract is made between the Government, represented by the Permanent Secretary, MoW (described as the "Contracting Authority") and IFF (described as "the Contractor"). It recites the fact that the Contracting Authority had accepted the contractor's tender for the execution and completion of the Works (as described) for the price of Tshs 11,480,995,521 (the "Contract Price").

1.5     The original contract period (specified in Art 34 of the Special Conditions) was 24 months, including a mobilisation period not exceeding six months. Commencement took place on the day that the contract was signed (7th May 1999) so that the project was due to be completed by 7th May 2001 (the original contract period).

1.6     Clause 3 of the Agreement recites the contractor's covenant with the Contracting Authority (i.e. the Respondent) to execute and complete the Works (as defined) and remedy any defects, in consideration of the payments to be made by the Contracting Authority to the contractor as mentioned.

1.7     The Agreement is dated 7th May 1999, and appears on its face to have been signed (or executed) on behalf of the Claimant (by its predecessor IFF) by Mr Robert Sapone and on behalf of the Respondent by Mr S Odunga, the Permanent Secretary, MoW.

1.8     Other parties named in the Agreement are the Supervisor (named as the Director of Roads, Ministry of Works, Tanzania) and the Supervisor's Representative (COWI, Consulting Engineers and Planners).

1.9     The Contract was funded *inter alia* by donations from the European Union, the Donor Agency being the Ministry of Finance, Italy and the "Donor Managing Agent" being a delegation of the European Union.

1.10    The EDF Rules, which formed part of the Contract documents, provide (in Article 1) that disputes relating to a contract financed by the EDF shall be resolved by

---

[8]     This is the first document in Volume I of the Contract documents.

arbitration and such arbitral proceedings shall be commenced by a notice of arbitration served in accordance with Article 18.[9]

*Background to the dispute*

1.11    The background to the dispute between the parties concerns nine claims made by the contractor, submitted to the Respondent under cover of letters dated 18th March 2002 (claims 1 to 3), 5th April 2002 (claims 4-8) and 1st October 2002 (claim 9). The nine claims[10] are for:

(Claim 1)      Delays and disruption due to relocation of services.[11]

(Claim 2)      Exceptional risks due to failed design of sub-base.[12]

(Claim 3)      Delayed instructions and drawings for bridges.[13]

(Claim 4)      Acceleration.[14]

(Claim 5)      Late instruction for Administration Orders.[15]

(Claim 6)      Additional works – repairs to pothole.[16]

(Claim 7)      Reconstruction due to failed sub-base design.[17]

(Claim 8)      Variation of price of diesel for general services.[18]

---

[9]     The Notice of Arbitration (NoA) was served by the contractor in May 2004. See paragraph 11.16 below.

[10]    The list is adopted verbatim from section 4.2 of the NoA. Two additional claims were added in the SoC as finally served and they are dealt with in Section 2.

[11]    This is summarised in Section 1.1 of the Scott Schedule and addressed in the Gibb Report at section 6.1 and in the G&T Report sect 3.0 (which deals with all of the EoT claims together).

[12]    Scott Sched 1.2; Gibb Report sect 6.2; G&T sect 3.0.

[13]    Scott Sched 1.3; Gibb Report sect 6.3; G&T sect 3.0.

[14]    Scott Sched sect 2; Gibb sect 6.4; G&T sect 4.0.

[15]    Scott Sched sects 3 & 4; Gibb sect 6.5; G&T sects 5.1 & 5.2. There are two discrete aspects to this claim: (i) a claim for the alleged increased costs resulting from Administrative Order no 1 (AO1, exhibited as Folio B.1 in Vol 2 of the Gibb report) relating to various matters, e.g. construction of 300m of road in Bagamoyo (the original Claim 5(a)); and (ii) a claim for the alleged increased costs resulting from Administrative Order No 2 (AO2, exhibited as Folio B.2 in Vol 2 of the Gibb report), being a modification of the sub-base material to include concrete (the original Claim 5(b)).

[16]    Scott Sched sect 5; Gibb sect 6.6; G&T sect 5.3. Again another misnomer, as the claim relates to many more matters than a single pothole (see Section 2 of this Award at paragraph 2.29).

[17]    Scott Sched sect 6; Gibb sect 6.7; G&T sect 5.3. The claim is for costs incurred in relation to the reconstruction of the sub-base between Km30-31 and between Km 32-34. It appears that this claim became a claim for the reconstruction of the complete roadway between Km30 and Km 34. It also appears that this claim became subsumed at some point within claim 6 – see Sched 1 to the SoC.

(Claim 9)        Damages caused by wrongful deduction of contractor's monies.[19]

1.12    The claims totalled US$9,570,768 plus €1,477,821.[20]

1.13    In addition, the Claimant (defined in the NoA as IFF) alleged further breaches of contract on the part of the Respondent, as set out in NoA subparagraphs 4.2 (x) to (xv).

1.14    As a result of the alleged breaches, the Claimant sought additional relief as set out in paragraph 4.7 of the NoA, namely:

    (i)      a declaration that the Claimant is entitled to terminate the Contract;

    (ii)     a declaration that time is "at large" under the Contract;

    (iii)    a declaration that the Claimant is entitled to an extension of time;

    (iv)     damages for breach of Article 65 of the Contract by the Respondent;

    (v)      an adjustment to the Contract Price;

    (vi)     interest; and

    (vii)    costs.

1.15    Following submission of the claims by the contractor in the Spring of 2002, and a purported termination by the contractor under Article 65 of the contract conditions, a period of a few months ensued under which the parties appear to have attempted an amicable settlement of the claims, without success.

*Notice of Arbitration*

1.16    By a letter dated 25th May 2004, addressed to the Permanent Secretary, MoW, IFF (as agent for or otherwise on behalf of SCEL) served the NoA on MoW.

1.17    The NoA was expressed as having been served pursuant to Art 18 of the EDF Rules, and cited (on its cover) IFF as Claimant and the Government as Respondent.[21]

---

[18]    Scott Sched sect 7; Gibb sect 6.8; G&T sect 5.6.

[19]    Scott Sched sects 9 and 10; Gibb – not considered; G&T sect 6.0.

[20]    NoA, paragraph 4.2. There are two additional pleaded claims in the SoC, which are summarised in Section 2 below. In the SoC, the claims were all expressed in € rather than US$. The currency issue is dealt with in paragraphs 2.56 to 2.57 below.

1.18    In section 1 of the NoA, IFF was described as "Now incorporated within 'Stirling
        Civil Engineering Ltd' ("SCEL") of UK Nationality". The former and current
        registered office addresses of SCEL are given, as is the Tanzanian registered
        office address of IFF. The Respondent is described as the Government of
        Tanzania, "represented by" the Permanent Secretary, MoW.

1.19    The NoA contained (in paragraph 4.2) the summary of claims set out in paragraph
        1.11 above and (in paragraph 4.7) the additional relief summarised in paragraph
        1.14 above.

1.20    As set out in paragraph 1.14 above, the additional claims for relief included claims
        for declaratory relief as follows:

        (1)     that the Claimant is entitled to terminate the Contract;

        (2)     that time is "at large" under the Contract; and

        (3)     that the Claimant is entitled to an extension of time.

1.21    As regards the first two of these claims, the tribunal notes that they were not dealt
        with at all in the Claimant's SoC, nor developed in any further submissions
        between the parties. Accordingly, the tribunal makes no award in respect of the
        claims for a declaration that the Claimant is entitled to terminate the contract or
        the claim that time is "at large" under the Contract.

1.22    As regards the third claim for declaratory relief (entitlement to extension of time),
        the tribunal has dealt with this claim substantively in its Award as further set out
        below (see in particular section 3).

1.23    The tribunal also notes that the claims for additional relief included a claim for
        damages for breach of Article 65 of the Contract by the Respondent and a claim
        for an adjustment of the contract price. Again, since neither of these claims was

---

[21]   A copy of the NoA (without the Annexe of copy documents) is attached to this Final Award as
       Annex A. By its Partial Award dated 28th October 2005, the arbitral tribunal has declared that
       SCEL is substituted as Claimant in place of IFF.

articulated in the SoC or dealt with further in any written submissions between the parties, the tribunal makes no Award in respect of either claim.

1.24    As to the claims for interest and costs, the tribunal will deal with these claims in its Final Award.

*Constitution of the arbitral tribunal*

1.25    The tribunal was appointed in the circumstances set out in detail in the Partial Award. The Partial Award also recites the history of the arbitration proceedings up to that point (October 2005). Following the Respondent's unsuccessful attempt to challenge the Partial Award in the Tanzanian courts, the Claimant gave notice in February 2008 of its intention to proceed with the arbitration in order to deal with the substance of the claims.

*Service of pleadings and further directions*

1.26    The Statement of Claim (SoC) had been served on behalf of IFF/SCEL on 5th May 2005 and a Statement of Defence ("Defence") served by the Respondent on 13th June 2005. The Defence dealt with the merits of the claims, but was expressly served without prejudice to, and therefore included, four "Preliminary Objections" (POs).

1.27    The Respondent's POs concerned: (i) the standing of the Claimant (then IFF); (ii) limitation; (iii) consistency; and (iv) the presentation of the claims. By agreement the Respondent maintained only the first two POs, which were dealt with in (and dismissed by) the Partial Award.[22]

1.28    By its Reply dated 1st August 2005 (served in accordance with Direction 2.4 of AN6), the Claimant dealt with only the POs raised by the Respondent. It was agreed that the balance of the Reply would be served on a later date. This in fact did not occur, though the tribunal have assumed that the Reply consists of the Claimant's responses to the Defence as set out in the Scott Schedule (see below).

1.29    On 28th October 2005 the tribunal issued the Partial Award dismissing the Respondent's Preliminary Objections. By Arbitral Notice No. 8 dated

---

[22]    Witness statements were also exchanged by the parties on 4th July 2005. Where necessary, these are referred to below.

4th November 2005, the tribunal sought the parties' submissions on the costs of the Partial Award and as to the POs. These submissions were supplied in due course.

1.30   Having considered the parties' submissions, the tribunal has decided to and hereby awards the Claimant its costs incurred in connection with the POs and the Partial Award (including the associated fees and expenses paid to the tribunal by the Claimant).

1.31   However, the tribunal will deal with the quantum of those costs, fees and expenses in its Final Award (which will also deal with (a) the overall remaining costs of the reference and (b) interest on (i) amounts awarded in respect of the substantive claims and (ii) costs).

1.32   On 26th February 2006, the G & T report was served on the Respondent and on the arbitral tribunal.

1.33   By email dated 26th February 2008, Mr Kesaria on behalf of the Claimant notified the tribunal members that the Respondent's application for leave to appeal against the decision to dismiss its Petition to remove the tribunal made by Hon Mjasiri J in the Commercial Court in August 2007 had failed, so that all court proceedings in Tanzania in respect of the Partial Award had come to an end. Mr Kesaria confirmed that the Claimant sought continuation of the arbitration proceedings concerning the substantive dispute at the earliest.

1.34   By email dated 27th May 2008 addressed to the advocates of both parties, the tribunal directed the Claimant to serve a list of issues indicating where each issue is found or discussed in the materials already served (i.e. a type of Scott Schedule) by 20th June 2008.

1.35   By email dated 20th June 2008, Mr Kesaria for the Claimant served the Claimant's complete Scott Schedule in compliance with the tribunal's direction of 27th May 2008.

1.36   On 23rd July 2008, Arbitral Notice AN 11 was issued, giving formal notice of the hearing of the substantive issues in the matter to commence on Monday 22nd September 2008 at the Mövenpick Hotel, Dar es Salaam. By an email addressed to the tribunal members (copy to Mr Kesaria) dated 23rd July 2008, Mr Mkono advised that his firm had not been instructed by the Respondent to

represent it in the continuing proceedings, and so suggested that he would forward the email to the Respondent.

1.37    By a further email dated 4th August 2008, addressed to the tribunal (copied to Mr Kesaria), Mr Mkono confirmed that his firm had been instructed by the Respondent to represent it in the continuation of the arbitration proceeding. He had been further instructed to assist the tribunal in preparing a Scott Schedule and sought until 1st September 2008 to serve the same. This was agreed by the tribunal (by email from the chairman to both parties sent on 6th August 2008).

1.38    The Respondent's version of the Scott Schedule was duly served on 1st September 2008.

1.39    By a "joint memorandum" dated 5th September 2008 from both parties, sent via email from Mr Kesaria and addressed to the tribunal, the parties requested that in place of a hearing, the matter should proceed on a documents-only basis, and the tribunal was directed to read the following documents:[23]

   (i)     The pleadings (meaning the SoC and Defence).

   (ii)    The four witness statements of fact.[24]

   (iii)   The two Scott Schedules produced by the parties (see above).

   (iv)    The Gibb report (see below) and the G&T report.

1.40    By Arbitral Notice no 12 sent to the parties on 8th September 2008 the President of the tribunal advised the advocates for each party that the tribunal members wished to convene in Dar es Salaam for the purposes of deliberating and also if required to seek clarification from counsel and/or from any expert instructed by the parties during the week commencing Monday 22nd September 2008.

1.41    Accordingly, on Sunday 21st September 2008, the tribunal began informal deliberations at the Mövenpick Royal Palm Hotel in Dar es Salaam. The tribunal completed its deliberations on Saturday 27th September 2008, after hearing further evidence on Thursday 25th September 2008 from Mr McSheaffrey on behalf of the

---

[23]    The tribunal has in fact and considered read many of the source documents referred to in the above-named documents, some of which are referred to in this Award.

[24]    There were two witness statements served by each party.

10

Claimant, Mr De Souza on behalf of the Claimant and Mr Severin Rwegumisa on behalf of the Respondent.

*The Gibb Report*

1.42    It appears that at some time in 2002 the Respondent (acting through the MoW) commissioned a report from Gibb East Africa on the Contract. There was historically some debate about the relevance and/or privileged nature of the Gibb Report, which had been sought by the Claimant from the Respondent at the preliminary hearing in September 2005 (which led to the Partial Award).

1.43    By its Arbitral Notice No 8 dated 4th November 2005, the tribunal directed the Respondent to serve the Gibb Report in full by 18th November 2005. Although this did not take place pending the challenge to the Partial Award, nevertheless copies of the unedited "Revised Final Report" (in two volumes) were served on the Claimant and on the tribunal by the Respondent in September 2008.

1.44    The Gibb Report is entitled "Provision of Contractual and Legal Advice for the [MoW] Regarding the Wazo Hill – Bagamoyo Road Contract – Revised Final Report".[25]

1.45    The Scott Schedule as completed by both parties helpfully incorporates both parties' comments by reference to the pleadings (SoC and Defence), and by reference to the Gibb report and the G&T Report.

1.46    The tribunal has had the benefit of reading, and is indeed grateful to the Respondent for providing, the unedited Gibb report. It should be noted that the tribunal has reached its conclusions independently of the views expressed in the Gibb report.

1.47    Section 2 of this Final Award summarises the individual claims and cross-references them to the SoC and Defence. Sections 3 to 9 deal with the claims in detail and contain the tribunal's findings on each claim. The dispositive part of this Award follows on after section 9 (see page 64).

---

[25]    Insofar as any privilege attaches to the legal advice contained in the Gibb report, it appears that this has been waived by the Respondent, either by the partial disclosure in 2005 or at the latest by the voluntary references to the report made in Respondent's comments in the Scott Schedule served on 1st September 2008.

### Section 2:  Summary of the Claims

***Claim 1: Extension of time claimed on basis of delays due to lack of free possession of site*** [26] (Amount claimed: subsumed in claims 2 and 3)
*SoC 20-40; Defence sect 2.0; Scott Sched sect 1.1; Gibb sect 6.1; G&T sect 3.0.*

2.1  Under this head of claim, the Claimant alleges that it was hampered in its access to the site by various causes (unforeseen and illegal pipework under or alongside the road[27], abundance of roadside graveyards, etc), which caused it a total delay of some 7.60 months, of which nearly 3 months ran concurrently with other delays, leaving a net 4.77 months of delay.

2.2  The intention to claim for an extension of time (EoT) under this head (along with other heads) appears to have been made in December 1999,[28] and the formulated claim itself followed in March 2000.[29]

2.3  The original amount claimed under this head was not specified, though an EoT of 16 weeks was sought, made up of 8 weeks direct extension and a further 8 weeks delay by reason of the works thereby being pushed back beyond the rainy season (see SoC para 32).

2.4  As eventually formulated, the EoT sought for this claim was 4.77 months (i.e. approximately 19 weeks), at a cost per month in Euros of €381,062.

2.5  The Respondent alleges that the claim should be rejected by reason of the contractor's failure to draw up an approved Performance Program (as per Art 17 of the General Conditions). The Respondent also asserts that the claim is not competent by reason of non-compliance with the notice and reporting

---

[26]  Scott Schedule section 1.1.

[27]  According to para 2.2 of the witness statement of Mr Leopold Mujjungi dated 4th July 2005, the illegal pipework consisted of several water pipes unlawfully connected to the main 54-inch water supply pipe from the Ruvu River to Dar es Salaam, which ran along the project road for over half of its length.

[28]  By letter dated 3rd December 1999 from IFF to MoW under ref IFF/JFM/184, exhibited as Folio 1.2 in Vol 2 (Appendices) of the Gibb Report.

[29]  By letter dated 14th March 2000 from IFF to MoW under ref IFF/JFM/323, exhibited as Folio 1.3 in Vol 2 (Appendices) of the Gibb Report. A copy of the claim itself (dated 6th March 2000) may be found at tab M of the exhibits to the witness statement of L Mujjungi dated 4th July 2005.

requirements of Art 35 of the Special Conditions and Art 55 of the General Conditions.[30]

2.6     An issue arises as to whether the claim is allowable at all due to alleged non-compliance with the reporting requirements under the contract and/or because the true cause of delay at this time was lack of equipment at the site.[31] This is discussed in section 4 below. An issue also arises as to substantiation of the claim, as well as whether the claim has been superseded by or is to be regarded as concurrent with the other alleged causes of delay discussed below.

***Claim 2: Extension of time claimed on basis of suspension of sub-base and changed design and scope of work*** (Amount claimed €2,667,432[32])
*SoC 41-53; Defence 3.3.1-3.7.5; Scott Sched sect 1.2; Gibb sect 6.2; G&T sect 3.0.*

2.7     Under this head of claim, the Claimant alleges that sub-base material recommended by the Respondent was (unknown to the contractor until after defects were discovered in the finished road) unsuitable as such over a stretch of the road from Km28-Km43, and accordingly delays were necessitated while the cause or causes of the sub-base failures were investigated and remedial measures adopted.

2.8     The Respondent denies liability for this claim, asserting that negligent construction and the fact that Art 30 of the General Conditions placed responsibility for soil studies, location, excavation etc on the contractor. The Respondent also asserts that the Claimant failed to comply with the reporting and/or notice requirements of the contract.

2.9     A total of 7 months' delay at a cost of €381,062 per month (i.e. a total of €2,667,432) has been sought from the Respondent under this head, though it would appear that this head is to be considered along with the alleged cause of delay under claim 3 below.

---

[30]   Article 35 of the Special Conditions and Article 55 of the General Conditions are reproduced in paragraphs 3.9 and 3.35 respectively below.

[31]   See IFF letter 16th May 2000, which refers to equipment being released from other projects.

[32]   SoC Schedule 1 and Appendix 2. The correct figure using the calculation 7 x €381,062 should in fact be €2,667,434. The Scott Schedule appears to contain an error in suggesting the amount is €2,149,185.

***Claim 3: Extension of time claimed on basis of delay in confirmation of bridge design*** (Amount claimed: €1,230,829[33])

*SoC 54-68; Defence sect 4.0; Scott Sched sect 1.3; Gibb sect 6.3; G&T sect 3.0.*

2.10    Under this head of claim, the Claimant alleges that it was delayed as a cause of late instructions regarding the Mpiji bridge design by 15 months (see Appendix 3 to the SoC), albeit that 11.77 months are alleged to run concurrently with the delays under claims 1 and 2, leaving a net of 3.23 months under this claim.

2.11    The background to this claim was an agreement of the parties, following a suggestion by the original contractor (IFF), to change the bridge works as follows: Mpiji Bridge – from rehabilitation to new bridge using the Rufiji Bridge design (as modified); Mkuza Bridge – from new bridge as designed to new bridge using the Rufiji Bridge design (as modified); and Nyakasangwe Bridge – as for Mkuza Bridge.  Three and a half (3½) months later, the Claimant indicated that it wished to revert to the original design.

2.12    The design for Nyakasangwe bridge, as originally intended, was received by the Claimant on 20th December 2000; the Claimant says this occasioned a delay of about 13 months.

2.13    The Claimant  also claims to have encountered further delays due to "exceptionally heavy water" for 11 weeks (or 2.75 months), delivery of steel piles was delayed for four weeks, and the quantities for piles for Mkuza Bridge and Nyakasangwe Bridge increased by more than 30% (53% to 97% of bill of quantities).

2.14    The Claimant requested a total EoT of 15 months; 12 months for construction of the bridges and at least 3 months for procurement; only 6 months was granted – that is up to 7th November 2001 (SoC para 63; see also Defence para 5.1.1) in March 2001,[34] but the Supervisor considered that the costs of the extended period for performance should be shared as the initial proposal for the changes in the bridge design had come from the contractor.

---

[33]    SoC Sched 1 and Appendix 3.

[34]    The letter is at p95 of Vol 7 to the SoC.

2.15   The Respondent denies liability for this claim, asserting that the Claimant had always had sufficient time to complete the bridge works and denying liability for delays in delivery of piles etc. The Respondent also disputes that heavy rains and/or adverse weather conditions justified an EoT.

***Claim 4: Acceleration*** [35] (Amount claimed: €594,636)
*SoC 69-78 & App. 5; Defence 5.1.1-5.3.6; Scott Sched sect 2; Gibb sect 6.4; G&T sect 4.0.*

2.16   It is alleged that as a result of the three causes of delay summarised above, by June 2001 the project was in material delay with forecast completion up to May 2002. At that time, an EoT of six months had been granted as a result of the delay in instructions concerning the Mpiji bridge design (see above), so that the renewed completion date was 7th November 2001.

2.17   Accordingly, on 4th June 2001, the contractor submitted an acceleration programme. In August 2001, the Supervisor's Representative sought information from the contractor as to his attempts to accelerate the works to bring them up to Schedule. On 29th September 2001, the Supervisor advised that the accelerated programme was rejected.[36] It appears that the acceleration was discontinued on 3rd October 2001, i.e. after some four months.

2.18   The original value of the claim was US$600,000, based on a calculation of US$150,000 x four months. This was later refined to a more precise figure of €594,636.[37]

2.19   The Respondent rejects liability for the claim on the basis that there is no provision in the Contract allowing for acceleration of the works.

2.20   There are issues concerning whether there is a provision for acceleration in the Contract, and whether the contractor has already been adequately compensated for the additional measures taken in the period from June-September 2001 (inclusive). These are discussed in Section 4.

---

[35]   Section 2 of the Scott Schedule.
[36]   Letter dated 29th September 2001 exhibited as R9 to the Defence.
[37]   See Schedule 1 to the SoC and App 5 for the breakdown.

***Claim 5: Late instruction for Administration Orders*** (Amount claimed: €228,440 and €341,151)

*SoC 107-113 and Apps. 6 & 7; Defence 8.1-8.2; Scott Sched sects 3 & 4; Gibb sect 6.5;[38] G&T sects 5.1 & 5.2.*

2.21    There are two discrete aspects to this claim (which appears to be a misnomer, as the costs claimed do not appear to have arisen as a result of any *delay* in issuing the orders):

    (i)    a claim in the sum of €228,440, being the alleged increased costs resulting from Administrative Order No 1 (AO1, exhibited as Folio B.1 in Vol 2 of the Gibb report) relating to various matters, e.g. construction of 300m of road in Bagamoyo (the original Claim 5(a)); and

    (ii)    the claim in the sum of €341,151, being the alleged increased costs resulting from Administrative Order No 2 (AO2, exhibited as Folio B.2 in Vol 2 of the Gibb report). This related to a modification of the sub-base material to include concrete, otherwise referred to as "cement sand stabilisation" (the original Claim 5(b)).

2.22    The background to the first element of this claim is that in the period March/April 2001, the parties discussed the possible extension of the contract's original scope of work with the construction of a 300m road section in Bagamoyo, some additional accesses to the road section between Km12 and Km0 (Wazo Hill), as well as some additional kerbs and turnoffs in high fill areas, etc.

2.23    The parties came to an agreement in relation to the works required and on 11th April 2001, the Respondent issued Administrative Order No. 1 ("AO1"), whereby it instructed the contractor to carry out the additional works.

2.24    As to this, the Respondent asserts that the contractor was aware and agreed prior to commencement of the works that the matters falling within AO1 would be treated as part of the original scope of the works and that any later instruction to complete the same would be without additional payment.

---

[38]    Gibb does not deal with Administrative Order No 1.

2.25   The second element of the claim relates to the additional work the contractor was required to undertake to stabilise the sub-base by the addition of concrete following the discovery that material from the Mpiji quarry was defective.

2.26   The only issues on this claim concern: (a) alleged non-compliance with Article 55 of the General Conditions of Contract; and (b) the allowable rate for the material; as well as (c) possible currency issues.

2.27   This head of claim is discussed in SoC paras 107-110, and the background to the related claim for an EoT at paras 79-92. The Scott Schedule at section 1.4 suggests that the claim is for an "Extension of Time up till Substantial Completion", although it is unclear on what basis this EoT is sought.[39] The actual time finally sought was 13.5 months (see Schedule 1 to the SoC).

2.28   There are issues here regarding substantiation of the claim, delay in presenting the claim, and currency issues, i.e. as to whether the amounts are properly claimable entirely or even partially in euros or dollars. It is unclear whether the loss as suffered by the Claimant has been suffered in local (Tanzanian) currency or other foreign currencies. These issues are discussed in section 5 below.

*Claim 6: Pothole repair costs at Km28+800 to Km 42+800* (Amount claimed: €293,639[40] and €248,206)

*SoC 114-133 & Apps 8-9; Defence 3.8 & 8.3-8.5; Scott Sched sects 5 & 6.1; Gibb sect 6.6;[41] G&T sects 5.3 & 5.4.*

2.29   There are two elements to this claim:

   (i)   a claim in the sum of €293,639 in respect of the cost of repair of potholes at the above chainages[42] (the potholes in question having allegedly been formed following failure of the sub-base material already claimed for by

---

[39]   The letter in respect of the claim dated 5th April 2002 (attached as exhibit R12 to the Defence) confirms that the contractor was not making a claim for an EoT on this ground as the delay was concurrent with other claims.

[40]   There is an error in paras 5.3.16 and 5.3.18 of the G&T report, where the figure is given as €293,693.

[41]   Sect 6.6 of Gibb deals only with the direct repair costs. The second element of the claim was not considered by Gibb.

[42]   Discussed in SoC paras 114-118.

the contractor); and

(ii)     a claim in the sum of €248,206 for reimbursement of the unpaid amount
         for the repair of 3.55kms which was originally constructed and which was
         not paid in accordance with Administrative Order No 2.

2.30    As to the first element of the claim (referred to in the G & T report as claim 6(a)),
        the contractor claims the balance of costs following a successful submission of an
        insurance claim for the direct cost of repairs to the potholes in the amount of
        €379,575 plus overhead (of which €89,807 plus 18% overhead was agreed and
        paid by the insurers)[43].

2.31    The contractor alleges that the difference between the two sums was due to late
        notification to the insurer, on the basis that it was not immediately apparent that
        the failures would have fallen due for reimbursement under the insurance policy.
        The net amount sought under this element is €293,639.

2.32    The second element of the claim (claim 6(b)) is for the sum of €248,206 in respect
        of reimbursement of the *original* carriageway costs between Km 30 and Km 34.
        This is the section of the road that suffered multiple failures due to the sub-base
        material being defective.

2.33    As to the carriageway repairs between Km 30 and Km 34, the contractor
        submitted a further insurance claim in the amount of €757,345 plus overhead, of
        which the insurer awarded €471,110 plus 18% overhead. The contractor asserts
        (SoC para 125) that the difference is the cost of the original laying of the sub-base
        and its subsequent removal.

2.34    The Respondent denies liability for both elements of this claim in their entirety
        (Defence paras 8.3.1 – itself referring back to paras 3.8.4-3.8.5 – and 8.4 – itself
        referring back to paras 3.10.1-3.10.2).

2.35    As to the first element, it is argued that the contractor's failure to notify the insurer
        should not result in a claim against the Respondent, and that in any event the

---

[43]     See SoC para 117.

underlying pothole damage was caused by the contractor's defaults and his "mishandling of the sub-base material" (Defence para 3.8.2[44]).

2.36   As to the second element, the Respondent merely asserts that it is not responsible for the claim by reason of the contractor's previous default.

2.37   There may be a currency issue arising out of the first element of this claim. The claim is discussed in section 6 below.

***Claim 7: Time related costs for maintenance of traffic and supervisor's laboratory facilities from 8th Nov 2001 to 22nd Aug 2003 (Amount claimed: €607,396)***

*SoC 134-135 and App 10; Defence 8.7; Scott Sched sect 6.1; Gibb – not considered; G&T sect 5.5.*

2.38   This is a claim for the costs associated with needing to reconstruct 3.55km between Km 30 and Km 34 as a result of the failed sub-base which formed the subject of Claim 2.

2.39   The contractor alleges that the instruction to replace the failed sub-base was additional works arising from a design change for which the contractor is entitled to payment, and for additional time in which the works were carried out, primarily time-related costs for the maintenance of traffic and supervisory facilities. The contractor seeks an EoT of 21.5 months with associated costs (this claim is accepted as included within Claim 2).[45]

2.40   The Respondent denies liability for the claim (Defence para 8.7.1), asserting that it is based on the contractor's original alleged breach of contract in not constructing the road properly.

2.41   The claim is discussed in more detail in section 7 below.

---

[44]   The same point is made by Mr Severin Rwegumisa in his witness statement dated 4th July 2005 at para 4.3.

[45]   See SoC para 135.

**First Additional Claim: Additional testing required by MoW** (Amount claimed: €6,892)

*SoC 140-143 and App 12; Defence 8.9; Scott Sched sect 8; Gibb – not considered; G&T sect 5.7.*

2.42    This claim, though not referred to in the NoA, has been pleaded in the SoC and no objection has been taken to its inclusion by the Respondent. Accordingly, the tribunal considers that it has jurisdiction to decide this claim.

2.43    The contractor claims reimbursement for the cost of an additional "Benkleman Beam test" carried out in October 2001 and August 2004. The Respondent denies liability for the tests, alleging that it did not require the contractor to carry out the tests.

2.44    Since the author of the G & T report (Mr McSheaffrey)  commented that he saw no request for this testing report and has valued the claim as nil, the tribunal intends to award €nil for this claim and it is not discussed further in this Award.

**Claim 8: Diesel fuel variation** (Amount claimed: €1,002,679[46])

*SoC 136-139 and App 11; Defence 8.8; Scott Sched sect 7; Gibb sect 6.8; G&T sect 5.6.*

2.45    The background to the claim is that in the contract, the original estimated amount of fuel was 6,851,741 ltrs. The final total amount consumed appears to have exceeded 10m ltrs,[47] although only 5,071,286 ltrs were approved (and paid for) by the Respondent, according to Final Certificate no 37.[48]

2.46    The claim is in essence a claim for the increase in price of fuel beyond the tax free base price agreed in the tender for the period after May 2001, being the original contractual period.

---

[46]    The figure is taken and is described in the Scott Schedule as a "minimum".

[47]    See App 11 to the SoC.

[48]    *Ibid.* The tribunal has checked Final Certificate No 37. The correct figure is 5,071,286 ltrs (p15).

2.47    Up to May 2001, it appears that the contractor submitted for and was paid a cumulative differential total of Tshs 471,253,200 (based on the difference between his cost price and the base price of Tshs 150 per litre) for 5,071,786 litres consumed between October 1999 and May 2001.[49]

2.48    The Respondent denies liability, on the grounds of alleged non-compliance with the contract conditions (specifically Art 48.2 of the General Conditions) and also on the basis that the claimed rates do not exceed the contractually agreed rate, so that the contractor would be unjustly enriched if the claim were met.

2.49    This claim is discussed more fully in section 8 below.

*Claim 9: Failure to pay certified sums due* (<u>Amount claimed: €1,691,757</u>)
*SoC 144-162 and Apps. 13-16; Defence 9.1-9.11; Scott Sched sects 9 & 11-12; Gibb – not considered; G&T sect 6.0.*

2.50    The contractor's claim under this head is for unpaid sums certified as due by or on behalf of the Respondent, under interim certificates nos. 26-31, and nos 36-37. It is understood that apart from one payment made in March 2006 by the European Union of €249,772, no other sums have been received by the contractor in respect of the unpaid certified sums due.

2.51    The contractor also seeks under this head additional financing costs and unabsorbed head office overheads (SoC paras 157-158/App. 16 and 159-162/App. 15 respectively).

2.52    The Respondent denies liability for the claim, asserting that it was fully entitled to withhold certified sums due on account of the contractor's delays, and its (the Respondent's) right to levy liquidated and ascertained damages (LADs) against certified sums due. The Respondent also asserts that the claim for financing charges is wholly unsubstantiated.

2.53    There are issues concerning currency and substantiation, as well as the Respondent's right to levy LADs, which will be discussed in section 9 below.

*Second Additional Claim: Frustration of the due Process of the Contract*

---

[49]    SoC App 11a.

2.54   This claim is set out in SoC paras 163-169. Since no damages have been claimed in respect of the alleged breach, it is not considered further in this Award.

*Currency of claims and currency of Awards*

2.55   The Claimant seeks an Award under all its heads of claim in euros (€).[50]

2.56   However, in respect of claims properly falling within the contract, for amounts which the Respondent would have been obliged to pay in accordance with the contractual split between euros and Tanzanian shillings (Tshs),[51] the tribunal considers that it is just and fair to award any such sums in accordance with such split.

2.57   Any such division in the currency of the tribunal's Award will be discussed in the context of the individual claims in sections 3 to 9 of this Award.

---

[50]   See SoC paras 176-186, 188, 189 and 192. Since this is the last incarnation of the Claimant's claims, the tribunal has assumed that this supersedes the formula adopted in the NoA of claiming in euros and in US dollars.

[51]   See p2 of the Agreement dated 7th May 1999 (in Vol 1 of the Contract documents).

**Section 3:**      *Claims for Extension of time (Claims 1, 2 and 3)*

*Issue: whether the Claimant is entitled to a further extension of time beyond 12th November 2001 and if so what date?*

*Introduction*

3.1   Unsurprisingly, the tribunal spent the majority of its time during deliberations on this single issue, as it impacts so much on the Claimant's claims.

3.2   In fact, this one issue bears directly on claims 1, 2 and 3, as well as indirectly on claims 7 and 8.

*Contractual programme*

3.3   Although the contract contemplated the submission of a programme (which had specific requirements as laid down in Article 17 of the Special Conditions), it appears that the contractor's original programme had never formally been approved by the Respondent – at least not until as late as 27th January 2001, when a revised programme was presented by the contractor and apparently accepted by the Supervisor.[52]

3.4   In section 4 of the Gibb report, there is a helpful discussion of the benefits of a contractor's programme containing a critical path, one such being the ability to measure the effects of delays more accurately.

3.5   Conversely, the authors of the Gibb report explain in section 4.1.2 how the lack of a detailed programme enhances the difficulty of establishing that delays or additional works have affected the critical path activities, and therefore of assessing the extent of the delay on the contractor's progress.

3.6   Nevertheless, the authors of the Gibb report concluded that although the failure to submit an approved programme was a breach of contract on the part of the contractor, the failure by the Supervisor or the MoW to insist on a fully compliant approved programme constituted a waiver of its rights, a view with which the

---

[52]   See letter dated 27th January 2001 with attached programme (a copy is attached as Folio 3.10 in Appendix E in Volume 2 of the Gibb report). It should be noted that the authors of the Gibb report were of the view that the what the contractor submitted was not a formal revised programme under Article 17.3 of the Special Conditions, but in effect a request for an EoT under Article 35 of the Special Conditions, and that it appears to have been treated as such by the Supervisor.

tribunal has some sympathy.

3.7    Furthermore, the Gibb report also concluded that the failure to submit an approved programme made it "extremely difficult, *although not impossible*, to establish that delays or additional work have affected critical path tasks and the effect of additional works on his planned progress" (see section 4.1.2, emphasis supplied).

3.8    The tribunal considers that in the circumstances, the lack of an approved programme compliant with Article 17 of the Special Conditions should not be a bar to a claim for an EoT where it is otherwise clearly demonstrable that delays or additional works affected the contractor's progress of the Works.

*Contractual basis for extension of time claims*

3.9    Article 35 of the General Conditions of Contract provide as follows:

> "*Article 35 : Extension of the Period of Performance*
>
> 35.1   *The Contractor may request an extension to the period of performance if he is or will be delayed in completing the Contract by any of the following causes:*
> (a)   *exceptional weather conditions in the State of the Contracting Authority;*
> (b)   *artificial obstructions or physical conditions which could not reasonably have been foreseen by an experienced contractor;*
> (c)   *Administrative Orders affecting the date of completion other than those arising from the Contractor's default;*
> (d)   *failure of the Contracting Authority to fulfil his obligations under the Contract;*
> (e)   *any suspension of the Works which is not due to the Contractor's default;*
> (f) *force majeure;*
> (g)   *any other causes referred to in these General Conditions which are not due to the Contractor's default."*
>
> 35.2   *The Contractor shall, within 30 days of becoming aware that the delay may occur, notify the Supervisor of his intention to make a request for extension of the period of performance to which he may consider himself entitled, and shall, as soon thereafter as is reasonable in the circumstances, deliver to the Supervisor full and detailed particulars of the request, in order that such request may be investigated at the time.*
>
> 35.3   *The Supervisor shall, by written notice to the Contractor after due consultation with the Contracting Authority and, where appropriate, the Contractor, grant such extension of the period of the performance as may be justified, either prospectively or retrospectively or inform the Contractor that he is not entitled to an extension.*

Article 35 of the Special Conditions provides as follows:

> 35.1   *The Contractor may request an extension of time to the period of performance in accordance with Article 35.1 of the GC.*
>
> *Additional quantities, which are not the result of an administrative order, site instruction or any other change in the original design, will not entitle the Contractor to claim for extension of time, unless they involve major work items*

- 24 -

*i.e. earthworks, culverts, rock excavation, base course, sub-base and equivalent, and then only if quantities of these exceed what was originally foreseen in the individual bill item by more than 30%, and/or if the cost of these extra quantities represent an average of 20% of the cost of the entire bill.*

*It shall be accepted that exceptional weather conditions, in particular rainfalls, are not measured against the monthly average obtained from data in the material and/or any other report that and/or meteorological stations in the area, but only against the maximum and minimum rainfalls for which data are available. The Contractor may request an extension of time in such case where the average rainfall over the entire construction period, of the particular road section in question, exceeds 25% of maximum rainfalls by taking into account any possibilities and efforts made to proceed with the works (or road sections) not affected by adverse weather conditions. It shall be noted, that the works are to be performed in an area with erratic rainfall, which do not provide a standard pattern i.e. exceptional rains shall be taken into consideration.*

35.2   *Following the receipt of the Contractor's intention to claim under the provisions of Article 35.2 of the GC, the Contractor shall deliver, to the Supervisor, full and detailed particulars as required, within an additional 30 days. Failure to comply herewith shall automatically disqualify the Contractor from an extension of time. Delays in providing said particulars can be accepted, but only upon specific request, and under the condition that the substantiation of the claim during this period is impossible, due to their nature, and that full particulars are provided at the earliest possible date hereafter.*

35.3   *The time allowed for the Supervisor to approve or reject claims for extension of time shall be 30 days from receipt of complete substantiation of the claim.*

*The claims for extension of time*

3.10   Against this background, the contractor originally submitted three formal claims for an EoT based on the following causes:

   (1)   The delay in bridge design.

   (2)   Delayed access to services.

   (3)   Failed sub-base material.

3.11   The first and second claims appear to be concurrent with the third, though all three claims will be considered.

**(1) Delay in bridge design**

3.12   It appears to the tribunal that the most important claim for an EoT is the one in respect of the delayed bridge design.

3.13   It is instructive in this regard that the Gibb report also considered this claim the most important. Accordingly, it will be considered first.

3.14   The original design for the Works included three bridges.

3.15    However, on a site visit held on 1st December 1999, a visit was made to one of the three bridges (Mpiji bridge) and it was concluded that a new bridge should be built if funds could be provided.[53]

3.16    The contractor put forward a suggestion that the bridge be built to the same design specification as the Rufiji bridge, which the contractor had recently built on another project in Tanzania. The contractor also suggested that it would be economically viable to construct all three bridges to the same design principle.[54]

3.17    The contractor's original programme (albeit not formally approved by MoW or by the Supervisor on its behalf) catered for three bridges being built over the contract period starting mid-January 2000 and completing January 2001 (i.e. 12 months),[55] sequentially, with periods of about one month between the first and second and between the second and third bridges.

3.18    Following the contractor's proposal at the site meeting in December 1999 referred to above, many months passed before a decision appears to have been taken by the Respondent on 2nd October 2000[56] to keep to the original design for the bridges, but to include extra works because of what were described as "the effects of the El Niño rains". This decision was notified to the contractor two days later.[57]

3.19    Notwithstanding the decision to revert to the original design, there appears to have been a further delay regarding the design of the new Mpiji bridge (see e.g. letter from IFF to COWI under ref IFF/JPM/589 dated 23rd October 2000[58]).

3.20    This design delay was certainly apparent as late as November 2000, when the revised design was still awaiting approval by MoW: see the contractor's letter of 11th November 2000 under ref IFF/JPM/638,[59] in which the contractor made clear

---

[53]    See para 6.1.3 of the minutes of the site meeting. A copy of the minutes may be found at SoC/Vol 7/p20.

[54]    See the minutes of the site meeting contained in SoC/Vol.7/p20 at 6.1.3.

[55]    See the contractor's original programme at Vol 1 of the Contract documents at Sched 7, section E.10.

[56]    Letter MoW to COWI at SoC/7/100.

[57]    Letter COWI to IFF dated 4th October 2000 at SoC/Vol.7/116.

[58]    SoC/Vol.7/83.

[59]    SoC/Vol.7/80.

an intention to make a formal claim for an EoT arising from the new bridge design as soon as the approved drawings were received.

3.21    By letter to MoW dated 21st December 2000 (under reference IFF/JPM/734), the contractor formally submitted a claim for an EoT of six months and associated costs in relation to the delayed bridge design for Nyakasangwe Bridge only.[60]

*Compliance with contractual notification provisions*

3.22    There now arises an issue with regard to whether the contractor complied with Articles 35.2, 35.3 and 55 of the General Conditions of Contract and Articles 35.2 and 35.3 of the Special Conditions of Contract.

3.23    The Respondent asserts that there was no such compliance (Defence, paragraph 4.1.1).

*General Conditions – Article 35*

3.24    Article 35.2 of the General Conditions (set out in paragraph 3.9 above) contains two stages: (a) notification of the intention to bring the claim (the "notification requirement", as described by Gibb) and (b) the furnishing of "full and detailed particulars" of the claim (the "reporting requirement", as described by Gibb). Article 35.2 provides in summary that the contractor is to notify the Supervisor within 30 days of becoming aware that a delay may occur of his intention to seek an EoT. He must also deliver full and detailed particulars of the request "as soon thereafter as is reasonable"

*Special Conditions – Article 35*

3.25    The tribunal accepts that where there is any conflict between the General Conditions and the Special Conditions, the latter should prevail. In relation to Article 35, there does appear to be some inconsistency between the General and Special Conditions, though the exact interplay between the two is not easy to discern and the provisions appear confusing when read together. What is clear is that the opening language of Article 35.1 of the Special Conditions does not displace Article 35.1 of the General Conditions, so that the two provisions were

---

[60]    The first page of this letter is at SoC/Vol.7/72; the second page is inadvertently misfiled at SoC/Vol.7/91. Also, the letter appears to have been originally dated 14th December 2000, and this is the date referred to in the response from the MoW.

intended to be read together. However, there is no obvious inconsistency between the two provisions (rather, there is one internal inconsistency, as noted below).

3.26   Article 35.2 of the Special Conditions (also set out in paragraph 3.9 above) provides in summary that the contractor is to deliver to the Supervisor full and detailed particulars of the claim within an additional 30 days from notification of the intention to claim.

3.27   The next two sentences of Article 35.2 contain an apparent inconsistency. The second sentence states clear that "Failure to comply herewith shall automatically disqualify the contractor from an extension of time."

3.28   The third sentence, however, provides that "Delays in providing said particulars can be accepted, but only upon specific request, and under the condition that the substantiation of the claim during this period is impossible, due to their nature, and that full particulars are provided at the earliest possible date hereafter."

3.29   The inconsistency between these two provisions appears to have been implicitly accepted in section 10.3 of the Gibb report, which recommended that Article 35.2 be amended, *inter alia* by removing the second sentence.

3.30   Although there appears to be an internal consistency, the issue as to compliance must be an academic one, by virtue of the concession by the Supervisor that Article 35 had been complied with.

3.31   The letter from MoW of 12th February 2001 (under letter reference AC.128/382/01/PC/108[61]) confirms that the Respondent accepted that the contractor complied with the notification and reporting requirements under Article 35.2 of the Special Conditions: "*We are now of the opinion that you have submitted full and detailed particulars as required under Article 35.2 of the Special Conditions of contract.*" (Although no mention is made of the *General* Conditions, this is probably not material.)

3.32   In addition, the Scott Schedule prepared on behalf of the Respondent makes no

---

[61]     SoC/Vol.7/97. Note that this letter refers to the contractor's letter of 14th December 2000, although this letter appears to have been re-dated 21st December 2000 (see fn 60 above.).

mention of any breach of Article 35 of either the General or the Special Conditions.

3.33    Since the reaction to the request for an EoT by the MoW (discussed above) was not to assert any breach of Article 35, the tribunal would, if necessary, hold the Respondent estopped from relying on Article 35.2 of the General or Special Conditions, in the light of the letter of 12th February 2001 from the MoW referred to above.

3.34    The reference to Article 35.3 of the General Conditions in the Defence (para 4.1.1) is not understood. That provision imposes on the *Supervisor* an obligation to grant or reject an application for EoT. Accordingly, the allegation that this provision was breached is not considered further in this Award.

*General Conditions - Article 55*

3.35    Article 55 of the General Conditions concerns claims for additional payment (rather than claims for extension of time) and provides as follows:

*Claims for Additional Payment*

55.1    *If under the Contract there are circumstances which the Contractor considers entitle him to additional payment, the Contractor shall:-*
        *a)        if he intends to make any claim for additional payment, give to the Supervisor notice of his intention or make such claim within 15 days after the said circumstances become known to the Contractor, stating the reason for his claim; and*
        *b)        as soon as is reasonably practicable after the date of such notice but not later than 60 days after such notice, unless otherwise agreed by the Supervisor, submit to the Supervisor full and detailed particulars of his claim. In any event, such particulars shall be submitted no later than the date of submission of the draft final statement of account. The Contractor shall thereafter promptly submit such further particulars as the Supervisor may reasonably require to assess the validity of the claim.*

55.2    *When the Supervisor has received the full and detailed particulars of the Contractor's claim that he requires, he shall, without prejudice to Article 21.4 after due consultation with the Contracting Authority and, where appropriate, the Contractor, determine whether the Contractor is entitled to additional payment and notify the parties accordingly.*

55.3    *The Supervisor may reject any claim for additional payment which does not comply with the requirements of Article 55.*

3.36    Article 55.1(b) essentially provides that the contractor must submit "full and detailed particulars" of his claim within 60 days of giving notice of a claim for additional payment, although it contains a provision entitling the contractor to submit full and detailed particulars of his claim not later than the date of

submission of the draft final statement of account, provided the Supervisor agrees.

3.37   As to Article 55.3, MoW made an express reference to Article 55.1 in its letter of 12th February 2001 referred to above. Curiously, this letter appears to have been written precisely 60 days after the contractor's letter of 14th December 2001 (though *quaere* whether the letter was in fact sent then or on 21st December). The letter from the MoW merely noted the contractor's intention to claim additional costs under Article 55.

3.38   Nine days later, however, MoW relied on Article 55.3 expressly in its letter of 23rd February 2001 (under reference AC.128/382/01/PC/124[62]). In that letter, MoW informed the contractor that since it had failed to submit full and detailed particulars of the claim within 60 days (pursuant to Article 55.1 of the General Conditions of Contract), the claim for additional payment was rejected pursuant to Article 55.3.

3.39   It is instructive at this stage to consider how the Gibb report viewed this letter. In section 6.3.4, the Gibb report stated as follows:

> "*By rejecting the Contractor's claim before detailed particulars were available for assessment, **the Supervisor has misled the Contractor and has not afforded him a fair hearing**. This being the case, we consider that the Supervisor has effectively rendered the reporting requirements of Article 55 null and void. His rejection of the Contractor's claim pursuant to Article 55.3 is therefore not tenable.*"

(Emphasis supplied.)

3.40   The tribunal has some sympathy for the proposition that the Respondent appears to have rejected a meritorious claim for additional costs prematurely, and without regard to the circumstances in which the contractor's claim has been brought. This is particularly so bearing in mind the fact that: (a) Article 55.1(b) does not contain either an automatic bar on late submissions, or an express right to reject a claim for being late; (b) the Supervisor awarded an extension of time under Article 35, so recognised that there would be costs involved; and (c) up to the date of the letter of 21st February 2001 the full submission was – if the contractor's letter was in fact sent on 21st December 2000 – only two days overdue, which would be *de*

---

[62]   SoC/Vol.7/96.

*minimis*, or – if the letter was sent on 14ᵗʰ December 2000, only nine days overdue.

3.41   In the letter of 12ᵗʰ February 2001 referred to above, MoW suggested that absent the contractor's "proposal" to change the design of the bridges, revised drawings would have been issued on time to enable completion within the original contract period, but that in the circumstances, the "Client" (i.e. the Respondent) would defer the right to claim LADs until 7ᵗʰ November 2001, on condition that the contractor bore costs arising from the delay.

3.42   The contractor responded to the 12ᵗʰ February 2001 letter from MoW by letter on 28ᵗʰ February 2001, under reference IFF/EH/867.[63] That letter confirmed that the contractor was not prepared to accept the proposal in the final paragraph of the letter of 12ᵗʰ February 2001 (i.e. to the effect that an EoT would be granted on the basis that the contractor bore the costs).

3.43   By a letter dated 21ˢᵗ March 2001[64], the Supervisor awarded the contractor an EoT of six months, to 7ᵗʰ November 2001. (Subsequently, a further short extension of six days was granted by reason of some unexpected national holidays, so that the final revised completion date was 13ᵗʰ November 2001.)

3.44   The EoT of six months referred to above was (a) only in respect of the claim for bridge design; and (b) granted without costs.

3.45   The express rationale behind this refusal to grant costs was the fact that COWI had taken the view that the reason for the delay in the bridge design was partially the contractor's fault for having suggested a design change, rather than any further assertion of lack of compliance with Article 55 of the General Conditions.

*Gibb report*

3.46   Section 6.3 of the Gibb report contains a fairly thorough analysis of the claim for EoT in relation to the delayed bridge design.

3.47   The report concludes that the contractor ought to have been awarded an EoT of six

---

[63]   SoC/Vol.7/64.
[64]   SoC/Vol.7/95.

months plus a further 104 days (i.e. from 7th November 2001 to 18th February 2002). Coupled with the six days for the public holidays already granted, this would have meant an extension of time up to 24th February 2002.[65]

*Tribunal's conclusions on the EoT claim in relation to bridge design*

3.48   It is important to note that the Gibb report accepted that by reference to the contractor's revised programme, the EoT was justified by reference to the critical path analysis contained in the revised programme submitted in January 2001.[66]

3.49   However, as indicated in paragraph 3.17 above, the contractor had allowed 12 months for the building of bridges; thus, in the tribunal's view, the contractor should have been allowed the same duration to carry out these works. Since an EoT was granted for six months (at no cost), an additional six months should be granted in order to make up the 12 months.  The given extension of time was up to 7th November 2001[67] and up to 13th November 2001 upon adding six days for unexpected events which occurred. A further EoT of six months will result in extending the contractual period for completion to 12th May 2002.

3.50   In relation to other alleged causes of delay, the Claimant has not provided justification that the rainfall encountered was exceptional as per the third paragraph of Article 35.1 of the Special Conditions;[68] the parties envisaged that the works were to be performed in an area with erratic rainfalls. It was expected that the contractor would take anticipatory measures. Thus, there is no justification as to why the Respondent should be liable in relation to any claim based on the rainfall encountered by the contractor.

3.51   No legal/contractual basis is equally provided for the Respondent's liability in respect of the delayed delivery of steel piles.  The increase in quantity of steel piles was foreseen as per the contract.  Article 35.1 of the Special Conditions provides in material part as follows:

---

[65]   See paragraph 6.3.5(a)(iii).

[66]   See paragraph 6.3.5(a)(iii).

[67]   SoC para 63; see paragraph 2.14 above.

[68]   Set out in paragraph 3.9 above.

> *"Additional quantities, which are not the result of an administrative order, site instruction or any other change in the original design, will not entitle the Contractor to claim for extension of time, unless they involve major work items i.e. earth works, culverts, rock excavation, base course, subbase and equivalent; and then only if quantities of these exceed what was originally foreseen in the individual bill item by more than 30% and/or if the cost of these extra quantities represent an average of 20% of the cost of the entire bill".*

3.52   Additionally, Vol.1 Unit price schedule Pay Item 6A – 601(6) – Permanent piles – delivery – the stated price was to cover supply and delivery of piles to the length agreed after approval of the pilot pile's report. The Claimant's reasoning does not adequately cater for Art. 35.1. However, it is noted that no specific request for an EoT has been made as a result of these increases in quantities.

3.53   In all the circumstances, the tribunal concludes that it is reasonable for the contractor to be awarded an extension of time to 12th May 2002, due to delays occasioned by decisions to consider the change of design for the three bridges. As to whether the contractor is entitled to be reimbursed for any associated expenses with regard to this EoT, this is considered in connection with the next issue, after first considering the other two claims for delay.

**(2) Delays in access**

3.54   The first claim in respect of delay was in respect of an alleged lack of free possession of the site. This claim is summarised in paragraphs 2.1 to 2.6 above.

3.55   The Gibb report considered this claim in some detail before concluding (in section 6.1.5) that the contractor had failed to comply with the reporting requirements of Articles 35/55. Indeed, this defence is relied upon by MoW (see Defence paragraph 2.3.1).

3.56   The Respondent also rejects this claim on the basis it was the contractor's responsibility "to do his own due diligence" and carry out the necessary investigations, by reference to Section 001-07 of the Technical Specifications. It is stated that the contractor "failed in his contractual responsibility to carry out sufficient research on the presence of all services" (Defence paragraph 2.4.4).

3.57   Despite Respondent's contentions, having considered the details of the claim, the

authors of the Gibb report appear to have accepted it as having had merit, and indeed as having caused the contractor loss, although it was rejected for lack of substantiation (see Gibb report, section 6.1.4(b)(i) and (ii)).

3.58    The Respondent, on the other hand, nevertheless appears to attack the merits of the claim in the Defence (see section 2.4). The Respondent denies the claim that there was a term of the contract, express or implied, requiring the Respondent to place the contract site "at IFF's disposal free of any encumbrance" (paragraph 2.4.1).

3.59    Furthermore, it is contended by the Respondent that access to site is provided for under Article 9.1 of the General Conditions of Contract and that Article does not state that the Respondent should provide "the site free from all encumbrances". It is argued that all that was required of the Respondent was "to place the Site and access thereto at the disposal of the contractor in accordance with the programme of performance." It is stated on behalf of Respondent that MoW placed the contract site at the contractor's disposal in accordance with the provisions of Article 9.1 of the General Conditions (*ibid*).

3.60    As to the unlawful pipe connections, it appears to be not in issue as between the parties that the contractor encountered far greater delays to possession of the site by reason of the far greater number of unlawful pipe connections in existence than the contractor had been led to believe when submitting its tender. The same may be said in connection with the presence of graveyards very close to the line of the road, which hampered progress much more than envisaged. Indeed, there is very little refutation in the Defence of the claims that the contractor was severely impeded.

3.61    As regards the EoT, the amount sought under this claim was originally 4.77 months.

*Compliance with General & Special Conditions*

3.62    As noted above, the Respondent has alleged lack of compliance with Articles 35 and 55 of the Conditions of the Contract.

- 34 -

*Gibb report*

3.63   The issue of compliance with the contractual conditions was considered by the authors of the Gibb report. The report considered (at section 6.1.3) the compliance with the contractual requirements.

3.64   The contractor's original notification in accordance with Article 35.1(b) (with associated costs) was contained in its letter of 3rd December 1999 under reference IFF/EH/184.[69] This was considered by Gibb to comply with the notification provisions in Articles 35 and 55.

3.65   The contractor later submitted further details of its claim under cover of a letter dated 14th March 2000 (reference IFF/JPM/323[70]). This was 102 days after the original notification, and therefore strictly speaking outside even the more generous 60 day limit. Furthermore, full details of the losses suffered were not submitted by the contractor until 22nd January 2002 (see section 6.1.3 of the Gibb report). This was considerably outside the allowable contractual period, although as explained above the contractual requirements are not precise.

3.66   In any event, since the delay in question will have been superseded in terms of importance by the bridge design delays, the tribunal considers that as it has agreed that the contractor is allowed an EoT in respect of that claim, the claim for delayed access becomes otiose, in that it is subsumed within the more important (and longer) delay claim.

3.67   However, Gibb appears to have conceded that there were delays in relation to access that were not the contractor's fault or responsibility, and that there must have been some impact due to the disruption of the planned way of carrying out the Works. The written evidence of Mr Gerald R. Maregesi (the Respondent's witness) clearly supported this observation as it indicates that work was originally planned to commence from Km 43, but due to a lot of obstructions at Km 43, the contractor had to revise the programme in order to start work from Km 19; through two teams, one proceeding towards Km 43 and another towards Km 0.

---

[69]   A copy is at Folio 1.2 in Appendix C in Vol 2 of the Gibb report.

[70]   A copy is at Folio 1.3 in Appendix C in Vol 2 of the Gibb report.

3.68    Subsequently, due to the presence of several graveyards within the construction corridor at Km 17, 19, 26, 40 and 42, in October 1999, i.e. almost six months into a contract period of 24 months, the contractor was forced to change the working plan; it was given approval to start from Km 0, pending the relocation/removal of the graveyards.  Accordingly, the tribunal considers that the Respondent could hardly be said to have been treated unfairly by the grant of an EoT to cover both causes of delay, even if the actual losses suffered in respect of the second cause were not as thoroughly articulated as the contractual provisions suggest they ought to have been.

3.69    Accordingly, the tribunal will now consider briefly the third remaining alleged cause of delay.

**(3) Delays due to failed sub-base**

3.70    This claim is summarised in paragraphs 2.7 to 2.13 above.

*Gibb report*

3.71    This claim is also dealt with in some considerable detail by the authors of the Gibb report in section 6.2. They conclude as follows:

> "*1.    The contractor is responsible for locating and proving suitable sources of gravel for the subbase.*
>
> *2.    The borrow pits identified in the Soils and Materials Report were not designated pits.*
>
> *3.    The specification for the subbase was not changed by Administrative Order but in practice both parties to the contract accepted the contractor's proposed changes to the specification.*
>
> *4.    The subbase as laid was in accordance with the specification and was approved by the Supervisor's Representative.*
>
> *5.    The contractor was not instructed by the Supervisor to suspend the construction of natural gravel subbase. However, the subsequent revision to the pavement design introducing cement stabilised material for the subbase vindicated the contractor's decision to discontinue the use of natural gravel. The suspension of the subbase works by the contractor was not for his own convenience and as such he is entitled to recompense for the consequent delays.*
>
> *6.    Since the delay that occurred on the subbase is attributable to the time required to issue an Administrative Order to correct a design fault, the contractor is entitled to an extension of time equal to the period that the works were in effect suspended. This has been assessed as 78 days (2.56 months).*
>
> *7.    The contractor has not submitted detailed particulars to support his claim for recovery of the costs associated with the suspension of the subbase.*
>
> *8.    The extension of 78 days will result in the contract completion date being revised to 18 November 2001.*
>
> *9.    The contractor is entitled to recover prolongation costs arising from the extension. ...*"

3.72 The reference to an EoT in respect of the failed subbase to 18th November 2001 quoted above appears to be inconsistent with the summary of the claim given in the Executive Summary section of the Gibb report, in which it is stated in respect of this claim that "The contractor's claim has merit justifying an extension of time to 6 February 2002."

3.73 Again, in the light of the tribunal's view that an EoT to 12th May 2002 ought to be granted to the contractor, and its intention to award such EoT, it is not necessary to consider the detail of the claim for delay arising out of the failed subbase. However, the tribunal notes that the effects of the failed subbase were such as to mean the contractor was delayed in his completion of the Works.

3.74 The tribunal will consider whether and to what extent the contractor is entitled to prolongation costs associated with the award of an EoT of 12 months in its consideration of the next issue.

*Issue: Whether sums are payable in respect of the contractor's prolongation claim (i.e. during the period of any extension of time) and if so in what amount?*

3.75 It naturally follows, when an EoT is either granted by an employer (in this case the Respondent, or by the Supervisor acting on its behalf) or awarded by a tribunal, that consideration be given as to whether associated costs should also be awarded.

3.76 In the normal course of events, when an EoT is awarded, costs ought to follow except in cases where the cause of the delay is exclusively attributable to the contractor or beyond the control of both parties, in which case only those costs expended (i.e. net of profit) should be recoverable.

3.77 In the case of the claim for the delay in design of the bridges, the tribunal considers that this delay was not caused as a result of any default on the part of the contractor.

3.78 The only issue to consider here is whether the contractor should be denied what would otherwise have been a meritorious claim by reason of the alleged failure to comply with Article 55 of the General Conditions. This has been discussed above. The tribunal takes the view that in the circumstances, the fact that the contractor

had not complied with the 60-day limit in Article 55 is not an automatic bar to a claim. The full particulars of the costs incurred by the contractor were significant. In the tribunal's view, it was unreasonable to expect the contractor to put together a fully particularised costs submission in the period between mid-December 2000 and mid-February 2001, when such costs were likely to take much longer to calculate effectively.

3.79   The tribunal notes in this regard that the Respondent's own appointed independent consultant (Messrs Gibb & partners) considered that an EoT for the bridge design delay with costs was justified. The report estimated the costs to be approximately Tshs 1,772,979,000 (see Executive Summary) though it noted that "the costs will need to be substantiated by the contractor".

3.80   As to substantiation of the costs, the Claimant's expert, Mr John McSheaffrey of Gardiner & Theobald Fairway, has helpfully recalculated the Claimant's actual costs during the relevant period in his report prepared on behalf of the Claimant.

3.81   In respect of the period for which the tribunal awards the Claimant an EoT, the Claimant's average monthly running costs (based on its tender) were put forward in the SoC as being €519,408 for 2001 and €239,831 for 2002.[71]

3.82   These figures are correctly replicated in the G & T report (paragraph 3.44). However, the Claimant's actual monthly running costs were analysed in more detail in the G & T report. The report concluded that the average peak monthly production cost (ignoring two months' mobilisation and two months' de-mobilisation) was approximately Tshs 555,626,375 (paragraph 3.50).

3.83   During his oral testimony on 25th September 2008, Mr McSheaffrey explained and clarified his methodology. His evidence was not challenged by the Respondent.

3.84   Accordingly, and based on the EoT to which the tribunal considers the Claimant is entitled as set out above, the tribunal considers that the Claimant is entitled to associated prolongation costs in the amount of Tshs 555,626,375 per month from

---

[71]   See Sched 3 to the SoC.

7th May 2001 to 12th May 2002 (i.e. 12.2 months[72]).

3.85    The total sum awarded by the tribunal is therefore 12.2 x 555,626,375 = **Tshs 6,778,641,775**.

3.86    The tribunal considers that had the EoT been granted timeously by the Employer, the contractor would have been entitled to claim 74.627% in euros (on the basis of a fixed exchange rate of 1 euro = 778.8338 Tshs) and the balance in local currency.[73] 74.627% of Tshs 6,778,641,775 is Tshs 5,058,696,997. Divided by the contractual exchange rate of 1 euro = Tshs 778.8338 gives an amount in euros of €6,495,185.13€6,499,357.60. The balance (25.373%) is awarded in Tshs (**Tshs 1,719,944,778**).

3.87    Accordingly, the tribunal awards the Claimant the sum of €6,495,185.13 €6,499,357.60 and **Tshs 1,719,944,778** in respect of the Claimant's additional prolongation costs to 12th May 2002.

---

[72]    For this purpose, the tribunal considers that six days is equivalent to 0.2 months.

[73]    See p2 of the Agreement dated 7th May 1999 (in Vol 1 of the Contract documents).

**_Section 4:  Claim for Acceleration (Claim 4)_**

4.1     This claim is summarised in paragraphs 2.16 to 2.20 above.

   **_Issue: whether the Claimant is entitled to acceleration costs and if so in what amount?_**

4.2     The issue may be dealt with extremely briefly. In his report, Mr McSheaffrey concludes that having examined the Special Conditions, the contract appeared to make provision for acceleration. The tribunal respectfully disagrees, but in any event, as Mr McSheaffrey concludes (in paragraph 4.12 of his report) that the acceleration effort expended in the months June to September 2001 by the contractor was compensated by the interim payments made by the Respondent.

4.3     Accordingly, no payment can be due under this head of claim and the tribunal awards €nil.

***Section 5:***        ***Late instruction for Administration Orders (Claim 5)***

5.1     This claim is summarised in paragraphs 2.21 to 2.28 above.

5.2     As to the first element (increased costs resulting from Administrative Order no 1, known as AO1), the tribunal intends to deal with this claim quite briefly.

***Issue: whether the Claimant is entitled to additional costs for haulage and exchange fluctuations as a result of AO1 and if so in what amount?***

5.3     In paragraph 5.1.12 of his report, Mr McSheaffrey for the Claimant states that in his investigation of the costs which the contractor claims to have incurred, he was unable to find any indication of invoices for this type of expenditure.

5.4     In paragraph 5.1.14 of his report, Mr McSheaffrey confirms that he is unable to ascertain what additional costs the contractor might have been put to by virtue of the late execution of the accesses and culverts and in paragraph 5.1.17 of this report Mr McSheaffrey assesses the amount owing under this element of the claim as €nil.

5.5     Accordingly, the tribunal does not intend to rehearse the legal or factual arguments, but will accept the view of the Claimant's appointed expert as to the value of this claim as being €nil.

***Issue: whether the Claimant is entitled to additional costs for haulage and exchange fluctuations as a result of AO2 and if so in what amount?***

5.6     As to the second element of the claim (additional costs arising from Administrative Order No 2), the tribunal considers that the principle of the claim is sound, for the reasons set out in both the Gibb report and the G & T Report.

5.7     The tribunal notes that in the Defence, the Respondent has sought by analogy to rely upon an alleged non-compliance with Article 55 of the General Conditions (set out in paragraph 3.35 above).

5.8     Although its argument is not explicit, the Respondent appears implicitly to adopt the position taken in paragraph 6.5.3 of the Gibb report, where it is suggested that as the detailed particulars of the claim were not submitted until nearly eight months after the notification was received, there was a failure to comply with what Gibb describes as the "reporting requirement" of Article 55.1(b). As a consequence, according to Gibb, the Supervisor may reject the claim under Article 55.3.

5.9     There is nothing in the language of Article 55.3 suggesting that there is any automatic bar to a claim by reason of any failure to comply with Article 55.1. Accordingly, the fact that an entitlement to reject the claim may have existed is insufficient. On this basis, the defence to the claim must fail, since there is no evidence that the Supervisor did in fact reject this claim by reason of any alleged non-compliance with Article 55.1(b).

5.10    Furthermore, it is difficult to see how the 60-day notice period referred to in Article 55.1(b) would entitle the Respondent to reject any claim submitted outside the time limit. The relevant passage of Article 55.1 reads:

> "*[the Contractor shall]…(a) if he intends to make any claim for additional payment, give to the Supervisor notice of his intention or make such claim within 15 days after the said circumstances become known to the Contractor, stating the reason for his claim; and*
>
> *(b) as soon as is reasonably practicable after the date of such notice but not later than 60 days after such notice, unless otherwise agreed by the Supervisor, submit to the Supervisor full and detailed particulars of his claim. **In any event, such particulars shall be submitted no later than the date of submission of the draft final statement of account**. The Contractor shall thereafter promptly submit such further particulars as the Supervisor may reasonably require to assess the validity of the claim.*

(Emphasis supplied.)

5.11    The words highlighted above indicate that even where the 60-day period has expired, the contractor may still submit full particulars of a claim provided he does so not later than the date of submission of the draft final statement of account. Accordingly, it is difficult to construe the language of Article 55.3 as entitling the Respondent (through the Supervisor) to reject a claim unless it is submitted after the date of submission of the draft final statement of account.

5.12   Accordingly, the tribunal rejects the arguments set out in the Defence against this claim, it not being disputed that a variation was instructed and executed.

5.13   The only real remaining issue in the claim for the additional cost of stabilising the subbase concerns the applicable rate for the cement used in the process, i.e. the level of recompense due to the contractor.

5.14   In this regard, the Claimant set out in SoC Appendix 7 the costs claimed under this head of claim. These costs were reviewed by Mr McSheaffrey in Appendix 11 of the G&T Report. He concluded that the contractor had under-claimed in relation to the cost per tonne of cement (Tshs 64,750 as against what Mr McSheaffrey regarded as the actual amount of Tshs 68,775 by reference to actual invoices). However, he also considered that the plant hire costs and labour costs were overclaimed by 25% in each case. Lastly, he considered that the percentage for overhead and profit claimed (30%) was too low and should have been 38.79%.

5.15   Mr McSheaffrey concludes that the claimed amount (€341,151) was too high and that in his view the correct amount should be €146,318.

5.16   Following its deliberations, the tribunal requested Mr McSheaffrey to provide a recalculation of his Appendix 11 based on the unit price for the cement of Tshs 64,750 and an overhead and profit percentage of 30% in place of 38.79% (in other words, the rate and percentage sought by the contractor).

5.17   This recalculation was provided by the Claimant under cover of an email addressed to the tribunal by Claimant's counsel dated 20th November 2008. That email attached a spreadsheet from Mr McSheaffrey that contained the recalculation sought by the tribunal.

5.18   The amount claimed by the contractor was originally claimed in € (euros) but calculated in Tshs. The tribunal considers that since the cement was purchased and paid for locally, and since the remaining direct costs were incurred locally, it is appropriate for the claim to be awarded in Tshs only.

5.19   Accordingly, the tribunal awards the Claimant the total sum of **Tshs 41,008,001** in respect of Claim 5.

**Section 6:**        *Pothole repair costs at Km28+800 to Km 42+800 (Claim 6)*

6.1        This claim is summarised in paragraphs 2.29 to 2.37 above.

6.2        The first element of the claim concerns pothole repairs.

*Issue: whether the repair costs of potholes entitle the contractor to be reimbursed for its additional costs and if so in what amount?*

6.3        This issue is discussed in depth in the Gibb report (section 6.6), which appears to conclude that if (as was the case) the contractor was instructed to carry out repairs to the subbase, he would be entitled to an EoT (plus associated costs) to carry out the necessary repairs.

6.4        It appears to be common ground between the parties that the repairs in question were carried out. This has never been disputed by the Respondent. Ordinarily, therefore, even on a quantum meruit basis, the contractor would be entitled to some reimbursement, absent any particular factors which would entitle the Respondent to take the benefit of the contractor's work for free. In short, it is clear that the roadway suffered damage and was repaired by the contractor.

6.5        The main defence to the claim is the allegation that the damage in question was caused by the faulty workmanship of the contractor. The Defence also suggests non-compliance with Articles 35 and 55 of the General Conditions (see para 3.8.2 of the Defence). There is also a denial of responsibility by reason of the contractor's own late submission of this claim to the insurers (paragraph 3.8.5 of the Defence).

6.6        As to this last element of the defence to this claim, it is not clear on what basis the late submission of the claim by the Contractor to its insurers should prejudice the Respondent, nor on what basis this should somehow disentitle the Claimant from bringing a claim for what is essentially the balance of the cost after deducting the amount received by the insurers. Accordingly, this element of the defence is rejected.

6.7     As to alleged non-compliance with Articles 35 and 55 of the General Conditions, the tribunal notes that there is no substantiation of these allegations in the Defence, nor is there any evidence of any rejection of the claim by the Supervisor by reason of non-compliance with Articles 35 and 55. Accordingly, this element of the defence to this claim must fail.

6.8     In the G & T Report, there is some discussion of the fact that there was little by way of underlying support for the claim.

6.9     Specifically, there were no records of the cost of the complete repair of the 3.55kms of carriageway (see para 5.3.12). The two elements comprised the repair costs, and the cost of removal of the original carriageway. As to the former, Mr McSheaffrey identified and estimated a repair cost of Tshs 326,265,954.

6.10    Mr McSheaffrey was not able to estimate the cost of removing the original carriageway.

6.11    However, as the report confirms, there must have been some cost in removing the original carriageway in order to execute the replacement, though Mr McSheaffrey had seen no details. He accordingly estimated the cost at 25% of the cost of construction, i.e. a total of Tshs 241,485,154.

6.12    The combined cost of repair was therefore Tshs 567,751,108.[74] Mr McSheaffrey converted this figure to €729,440 at the contractual exchange rate of Tshs778.338 to the €. He deducted from this sum the amount the contractor had received by way of insurance monies (€661,892) in respect of its insurance claim, to leave a balance due to the contractor of €67,548.30.

6.13    The tribunal regards Mr McSheaffrey's reasoning as both sound and fair to both parties, and is content to accept the amount as he has calculated it. However, it is clear that although the original cost of repair would have been incurred perhaps mainly in Tshs, the contractor ought to have been able to include this as an additional item or variation, and therefore to submit his costs in the contractual ratio as between euros and Tshs (i.e. 74.627% in euros and the balance in Tshs).

---

[74]    The figures are rounded up or down to the nearest Tsh.

6.14    Accordingly, the tribunal considers that the appropriate amount to award in respect of this claim (Claim 6(a)) is €5~,400~€ 0,400.27 and Tshs 13,505,532 Tshs 13,330,958, being the equivalent of 25.373% of €67,548.30 at the contractual conversion rate

6.15    The second element of Claim 6 is a claim for the reimbursement of the contractor's costs incurred in the original repair of the road between Km 30 and Km 34.

6.16    The breakdown of the amount sought (€248,206) is set out in Appendix 9 to the SoC.

6.17    The tribunal considers that since liability for the failed sub-base material was not the contractor's, it follows that the contractor was not in breach of its contractual obligations in repairing the section of road in question in accordance with the contractual specification.

6.18    Furthermore, the tribunal considers the claim to be sound in principle, either in terms of contractual entitlement or on the basis of a claim in *quantum meruit*.

6.19    Mr McSheaffrey confirms that he verified the quantum of this claim (see para 5.4.8 of the G & T Report) and that the quantities were in his view correct, and that proper rates from the Bill of Quantities had been used. The Respondent has not sought to challenge this evidence.

6.20    Accordingly, the tribunal agrees that the contractor should be reimbursed its costs, albeit in accordance with the contract currency rates.

6.21    According to Appendix 9, the total amount claimed is Tshs 193,188,123. Under the Contract, the contractor was to be paid 74.627% in euros (on the basis of a fixed exchange rate of 1 euro = 778.8238 Tshs) and the balance in local currency.[75] 74.627% of Tshs 193,188,123 is Tshs 144,170,500. Converted at the contractual exchange rate of Tshs 778.329, [?] results in a euro element payable of €185,221.65.

---

[75]    See p2 of the Agreement dated 7th May 1999 (in Vol 1 of the Contract documents).

6.22    Accordingly, the tribunal awards the Claimant . . . . .    . . .  . . . . . US$185,109
        . . . . . . . . and **Tshs 49,017,62**. . .

*Section 7: Claim for reimbursement of the original sub-base (Claim 7)*

7.1    This claim is summarised in paragraphs 2.   29 to 2.4137 above.

7.2    The second element of Claim 6 is in effect a claim for time related costs for maintenance of traffic and supervisor's laboratory facilities from 8th November 2001 to 22nd August 2003 (21.5 months).

7.3    As the G & T report correctly noted, the recompense for the maintenance of traffic diversions and supervisor's lab facilities ought to be covered in any EoT claimed, but considered that the Claimant would have been entitled to a profit margin for the work normally carried out under the requirements of the contract Bills of Quantities rates, which would entitle the contractor to recover profit.

7.4    The G & T report considered this claim in section 5.5 and concluded that of the €607,396 sought,[76] only 5% should be recoverable, i.e. €30,370.

7.5    The amount sought to be recovered under this head, even at 5%, cannot be determined until the EoT is awarded with associated prolongation. The tribunal has already concluded that the Claimant is entitled to an EoT (with associated prolongation costs) up to 12th May 2002.

7.6    Accordingly, the tribunal considers that the 5% profit element, while fair and reasonable, should only relate to the shorter period of 12 months, not 21.5 months, and accordingly the tribunal has recalculated the amount due as being €16,950.69. This sum is duly awarded to the Claimant in respect of the profit element for the maintenance of traffic and supervisor's lab facilities during the period of extension.

7.7    As to the appropriate currency in respect of this element of the Award, the tribunal considers that it should be paid in accordance with the contractual split for euros/Tshs, i.e. 74.627% in euros and the balance in Tshs. 74.627% of €16,950.69 is €12,649   9. The balance (€4,300.90) is converted at the contractual exchange rate of Tsh. 778.338 = €1, making

---

[76]    See Schedule 1 and App 10 to the SoC.

7.8     Accordingly the tribunal awards the sums of €12,6~~45,750~~ and ~~Tshs 31347,399~~ ~~against……~~

**_Section 8: Claim for unpaid amount of VOP on Diesel (Claim 8)_**

8.1     This claim is discussed generally in paragraphs 2.45 to 2.49 above.

8.2     The Claimant claims a total sum of €1,002,679. Details of the alleged claim are contained in SoC App11 (referred to in SoC paragraphs 137 and 139) as follows:

      a)     a sum of Tshs 384,163,984 for the period from June 2001 to November 2001;

      b)     a sum of Tshs 232,551,554 for the period from January 2002 to February 2003; and

      c)     a sum of Tschs.163,707,480 for the period from March 2003 to October 2003.

8.3     In the G & T report, this is discussed in section 5.6, where it is concluded that the contractor should be awarded a total sum of €981,380 in respect of the period up to October 2003, with the months of September and October 2003 being excluded since substantial completion had taken place by August 2003.

8.4     No claim has been made in respect of VOP for any more recent period.

**_Issue: Whether there are additional costs of diesel and if so in what amount?_**

8.5     In the Gibb report (paragraph 6.8.3), an issue is raised as to the rate per litre of diesel fuel allowed in the contract and that claimed by the contractor, and a suggestion is made that the contractor may in fact be liable to reimburse the Respondent for overclaiming the cost of fuel.

8.6     The Claimant seeks to justify the alleged claim arising out of revision of diesel prices as follows:

- In the period from June 2001 to December 2001, the contractor consumed 3,478,557 litres of diesel for which he claims a variation price of Tshs 384,163,984.

    (The Respondent asserts in the Defence that these amounts imply an alleged price difference of TShs.110.44 per litre of diesel.)

- In the period from January 2002 to October 2003, the contractor consumed another 2,129,123 litres of diesel for which he claims an amount of Tshs 396,259,034.

    (The Respondent asserts that these amounts imply an alleged price difference of Tshs 186.11 per litre of diesel.)

8.7    The amounts of Tshs 384,163,984 and Tshs 396,259,034 total Tshs 780,423,018 (i.e. €1,002,679).

8.8    The Respondent also argues (Defence paragraph 8.8.2) that the claim should be rejected on the grounds *inter alia* of non-compliance with Article 48.2 of the General and/or Special Conditions of Contract.

8.9    The Respondent goes on to argue that Article 48.2(1), first paragraph of the Special Conditions only allows two price revisions for the duration of the Contract: the first after the mobilisation period and the second after the first twelve (12) months of the construction process. If price revisions are introduced after the mobilisation process, the revised price will remain unchanged during the first 12 months of the construction period. If (it is argued), after the first 12 months of the construction period, newly revised prices are introduced, they will remain fixed until the end of the contract period. Respondent suggests that this Article does not provide a price revision moment after expiry of the contract period.

8.10   The Respondent also asserts that in any event, under Art 48.2(1)(c) of the Special Conditions of Contract, the price revision does not apply to materials in respect of temporary work. Further, the revision does not apply to any permanent materials other than those inserted and priced in the Schedule of Basic Rates for Contract Price Adjustment annexed to the Bill of Quantities.

8.11    The claim and its annexures do not make the required distinction between the diesel consumption for permanent works and the diesel consumption for temporary works. As the price revision clause only applies to the diesel consumption in relation to the permanent works, it is argued that the Claimant's claim under this head may also fail (paragraph 8.8.3).

8.12    Article 48.2(1)(d) of the Special Conditions of Contract establishes the "upper-limit" for claims in relation to price revisions. It provides:

> 'The upper limit for which the Variation of Price for materials can be attributed is the amount and/or percentage of materials in relation to the final quantities as specified in the Bill of Quantities. It shall be noted and mutually accepted, that the Final Account for VOP is based on the final quantities of the permanent works only, and not on the quantities purchased and supplied to the site.'

8.13    It is common ground that although in his tender documents, the contractor proposed a unit price of Tshs 363.1214 per litre of diesel (referred to at paragraph 136 of the Statement of Claim), the parties agreed on a unit price of Tshs 220 per litre of diesel. The contractor confirmed this in his letter of 1 March 2002 (referred to at SoC paragraph 138).

8.14    In the Bill of Quantities, the Claimant included an amount of Tshs 1,507,382,943 divided by a unit price of Tshs 220 per litre, i.e. suggesting that 6,851,741 litres of diesel would be consumed. The Claimant confirmed this amount in his letter dated 1 March 2002.

8.15    It is also undisputed that the Respondent awarded the contractor a revision of price for a diesel consumption of 5,071,786 litres, and awarded and paid Tshs 471,253,200 to the contractor.

8.16    With his claim, the Claimant claims an additional price revision for the consumption of another (3,478,557 litres + 2,129,123 litres), i.e. a total of 5,607,680 litres of diesel.

8.17    Together with the first 5,071,786 litres of diesel for which a price revision was requested and awarded, the total amount is (5,071,786 litres + 5,607,680 litres) 10,679,466 litres of diesel.

8.18   Accordingly, the Respondent argues, the Claimant may not exceed or make any claim for an amount of fuel exceeding the contractual "upper limit" with (10,679,466 litres - 6,851,741 litres =) 3,827,725 litres of diesel.

8.19   In other words, the Respondent argues that Article 48.2 (1)(d) of the Special Conditions "caps" the claim for price revision at an amount of (5,607,680-3,827,725 litres=) 1,779,955 litres of diesel, so that the claim can only be valid for an amount of 1,779,955 litres of diesel in respect of the period from June 2001 to November 2001 for a sum of Tshs 384,163,984, i.e. in respect of 3,478,557 litres.

8.20   As noted by the Respondent in paragraph 8.8.7 of the Defence, the minutes of the pre-tender meeting held on 28 October 1998 state that:

> '*The Variation of Price method for materials shall remain unchanged, except that the reference amount for Diesel Fuel, to be quoted in the Schedule of Basic Rates, shall be the ex-Dar es Salaam rate (including VAT, customs and duty) but including road toll contribution as defined in Article 24.6 of the Instructions to Tenderers.*'

8.21   The following note is included in the Schedule of Basic Rates:

> '*The price to be quoted shall be the "pump price" (retail) on site (Wazo Hill / Bagamoyo) 30 days prior to the submission of the tender. Irrespective of the actual purchase price paid by the contractor, and source from which the fuel is obtained, the above shall be considered the reference amount. The Contractor will have to provide proof that his purchase price is in excess of the above quotation, and he shall be eligible for compensation only in excess of the above as specified in Article 48.2 of the Special Conditions.*'

8.22   In execution of the above, the reference price was fixed at Tshs 380 per litre of diesel. As stated above, the part of the claim not exceeding the upper limit is the one related to the first 1,779,955 litres for the period from June 2001 to November 2001. As calculated above, for that part of the claim, the Claimant requested a price difference of Tshs 110,44 per litre of diesel. This means that the reference price is not exceeded. The Claimant wants to be paid a price of (TShs.220 + TShs.110.44 =) TShs.330.44 per litre of diesel. This price does not exceed the agreed reference price of Tshs 380 per litre of diesel. On this basis alone, argues the Respondent, the claim must be rejected.

8.23    The Respondent also argues that the contractor's claim on revision of prices which were contractually agreed amounts to unjust enrichment on account of the Claimant having obtained exemptions on payment of road toll and import duty on fuels vide The Road Toll (Exemption) (Dar es Salaam   Bagamoyo Road Project) (Impresa Ing. Fortunato Federici SpA) Order, 1999 (Government Notice No. 414 of 1999) and Customs Tariff (Remission) (Dar es Salaam   Bagamoyo Road Project) (Impresa Ing. Fortunato Federici SpA) Order, 1999 (Government Notice No. 415 of 1999).

8.24    It is argued by Respondent that as the contractor's bid price included relevant taxes, the Claimant is effectively seeking a double benefit should not be allowed to unjustly enrich himself.[77]

8.25    Mr Rwegumisa provided a written witness statement on behalf of the Respondent (dated 4th July 2005) in which the relevant passages from the Defence are repeated almost *verbatim*.

8.26    Regrettably, the issues of over-recovery/unjust enrichment are not tackled at all in the G & T report. Nevertheless, the tribunal is satisfied that the claim relates to the cost of diesel consumed in the period beyond the originally agreed contractual completion date of May 2001, and the final (substantial) completion achieved in around August 2003.

8.27    Furthermore, Mr De Souza, who provided a witness statement in support of the claims, appeared before the tribunal on 25th September 2008 to give evidence *inter alia* on the VOP diesel claim and his evidence was entirely unchallenged by the Respondent.

8.28    Mr de Souza was quite emphatic in his evidence that the over-recovery/unjust enrichment issue was in fact a non-issue and explained in careful terms how the contractor purchased its fuel. Mr McSheaffrey, who was also present and gave direct unchallenged testimony on this issue, was satisfied that the prices paid and the amount claimed by the contractor were accurate, having himself (or by someone in his firm) checked the supporting data including invoices.

---

[77]    See Defence paragraph 8.8.8.

8.29    For that reason, the tribunal accepts this claim, albeit in the slightly reduced sum equivalent to €981,380.

8.30    As to the appropriate currency to award this claim, the tribunal considers that had the contractor's claim been accepted at the outset, it would have been incurred in Tshs (as the currency in which the fuel would have been purchased) but submitted as part of the contractor's certificates, i.e. with the appropriate split between euros and Tshs (7 4.627% in euros, the balance - €249,005.55 – in Tshs, converted at the contractual rate of Tshs 778,358 = €1).

8.31    Accordingly, the tribunal awards the Claimant under this head the sum of €732,374 and ~~Tshs 188,682,950~~ Tshs 193,810,482.

<u>*Section 9: Failure to pay certified sums due (Claim 9)*</u>

9.1    This claim is summarised in paragraphs 2.50 to 2.54 above.

9.2    It appears clear to the tribunal that the only defence to the claim for unpaid but certified amounts due to the contractor is an entitlement to withhold sums on the grounds of the contractor's alleged default, principally the delay in completing the Works.

9.3    As noted above, however, the tribunal considers that the Claimant is entitled retrospectively to an EoT to 12th May 2002, with associated prolongation costs.

9.4    Whether or not the failure to pay certified sums due gives rise to a claim turns on whether the delays after 12th May 2002 were wholly or mainly due to the contractor's default, such that the Employer was entitled to deduct LADs covering the entire amount of unpaid certified sums (equivalent to some €1.69 million.

***Partial Acceptance and rate for liquidated damages***

9.5    In paragraph 12.3 of Vol.1 of the Gibb report, attention is drawn to the Employer's beneficial use of the Works resulting in the contractor's exposure to LADs being proportionately reduced.

9.6    The tribunal enquired into this at the meeting of 25th September 2008.[78]  It is necessary to know what reductions ought to apply to the LAD rate in the contract once the Employer makes use of the contractor's Works; "*use*" has a proportionate consequence on the LAD rate.  It reduces, but by how much?

9.7    Dr De Souza of the contractor gave evidence describing how the Works were made use of.  Public traffic used the Works whether at mere sub-base phase and/or as and when parts of the facility were ostensibly finished *i.e.* all but road markings, works to adjacent land, cleaning and so on.  Further evidence is available from the minutes of Site Meeting No.39:

> "*The Contractor requested for a Provisional Acceptance for the section Km 0 to Km 14 as the road has been trafficked for more than one year.  The RE*

---

[78]    At which Mr Kesaria for the Claimant appeared, with Dr De Souza and Mr McSheaffrey and Dr Kapinga appeared for the Respondent, accompanied by Mr Rwegumisa.

*maintained his position that the following Works has (sic) to be completed before handover:*

*Tarmac on hard-shoulders;*

*Top soil on embankments;*

*Road drainage;*

*Sign boards;*

*Walkways at Mpiji. "*

9.8     Mr Rwegumisa of the Ministry took the tribunal to Volume IV(1) Contract Document ("Technical Specifications – Special") page 8 & 9 of 101, which discusses Passage & Control of Traffic:

> *"…It is an intention of the contract that public traffic should be able to pass along the road to be constructed/rehabilitated including culverts at all times during construction and in all weather.  For this purpose, the contractor will be required to order his work etc in such a way as to assure that a single lane at least 3.0 m wide is available for public traffic at all times and he shall furnish sufficient pilot cars and drivers, competent flagmen and the like to control and regulate the flow of traffic under one-way traffic operators…"*

9.9     It appears to the tribunal that there is an express duty on the contractor to allow or make use to the public of his Works as best as he can, and he did.  At the same time, Gibb is right that making use has a proportionate effect on the rate for LADs. The two provisions are mutually compatible.   The difficulty remains on how to re-calculate/proportionately reduce the LAD rate to reflect public use in part or whole and when. (The tribunal notes that by the date of meeting no. 39, there were balance works which legitimately prevented the Respondent from taking over the Works.)

9.10    Article 36.1 of the General Conditions of Contract (in Vol III of the Contract Documents)[79] provides as follows:

> *"If the Contractor fails to complete the Works within the time period(s) specified in the Contract, the Contracting Authority shall, without formal notice and without prejudice to his other remedies under the Contract be entitled to Liquidated Damages for every day or part thereof which shall elapse between the end of the period specified for*

---

[79]     Article 36 is not materially affected by the Special Conditions.

*performance or extended period of performance under Article 35 and the actual date of completion, at the rate and up to the maximum amount specified in the Special Conditions.*[80] *<u>If the Works have been the subject of partial acceptance in accordance with Article 59, the Liquidated Damages specified in the Special Conditions may be reduced in the proportion which the value of the accepted part bears to the value of the whole of the Works.</u>*

(tribunal's emphasis.)

9.11    Article 59 of the General Conditions of Contract[81] is headed "Partial Acceptance" and reads as follows:

"*59.1    The Contracting Authority <u>may make use</u> of the various structures, parts of structures or sections of the Works forming part of the Contract as and when they are completed. Any taking over of the structures, parts of structures or sections of the Works by the Contracting Authority shall be preceded by their partial provisional acceptance. However, Works may in cases of urgency be taken over prior to acceptance provided an inventory of outstanding work is drawn up by the Supervisor and agreed to by the Contractor and the Supervisor beforehand. Once the Contracting Authority has taken possession of a structure, a part thereof or section of the Works, the Contractor shall no longer be required to make good any damage resulting otherwise than from faulty construction or workmanship.*

*59.2    The Supervisor may, at the request of the Contractor and if the nature of the Works so permits, proceed with partial provisional acceptance, provided that the structures, parts of structures or sections of the Works are completed and suited to the use as described in the Contract*

*59.3    In the cases of partial provisional acceptance referred to in Article 59.1 and 59.2 the maintenance period provided for in Article 62 shall, unless the Special Conditions provide otherwise, run as from the date of such partial provisional acceptance.*"

(tribunal's emphasis.)

9.12    Article 60 of the General Conditions of Contract[82] is entitled "Provisional Acceptance" and reads in material part as follows:

---

[80]    The rate for LADs is stipulated in Art 36.1 of the Special Conditions as being capped at 0.1% of the value of the Contract per day, up to a maximum of 15%. This figure of 15% was subsequently reduced to 10%.

[81]    Article 59 of the General Conditions is not affected by the Special Conditions.

> "60.1 The Works <u>shall be taken over</u> by the Contracting Authority when they have satisfactorily passed the tests on completion and a certificate of provisional acceptance has been issued or is deemed to have been issued.
>
> 60.2 The contractor may apply, by notice to the Supervisor, for a certificate of provisional acceptance not earlier than 15 days before the Works, in the contractor's opinion, are complete and ready for provisional acceptance. The Supervisor shall within 30 days after the receipt of the contractor's application either:-
>
> > a) issue the certificate of provisional acceptance to the contractor with a copy to the Contracting Authority stating, where appropriate, his reservations, and inter alia, the date on which, in his opinion, the Works were completed in accordance with the Contract and ready for provisional acceptance; or
> >
> > b) reject the application giving his reasons and specifying the action which, in his opinion, is required of the contractor for the certificate to be issued.
>
> 60.3 ...If the Works are divided by the Contract into sections, the contractor shall be entitled to apply for separate certificates for each of the sections.
>
> ...
>
> 60.5 Immediately after provisional acceptance, the Contracting Authority may make use of all the Works as completed"

(tribunal's emphasis)

9.13   It appears from the above provisions that the reduction in the LAD rate arises on Partial Acceptance (Article 59). Article 59 indicates "*make use*" of temporary or permanent Works as and when completed.   "Make use" is within Article 59 'Partial Acceptance'. The machinery however anticipates a certificate of "Provisional Acceptance". That certificate precedes any taking over or making use of the Works.

9.14   It is a fact that use of the Works occurred on numerous occasions and almost from the outset.   But hardly any of the numerous instances was accompanied by operation of machinery of Articles 59/60.   It is then impossible to identify the occasions when the LAD was to be proportionately reduced.   The result is that

---

[82]   Article 60 of the General Conditions is not altered by the Special Conditions.

once a time or date arises when LAD ought to be applied, it is impossible to know what figure is to be applied. In those circumstances it is not open to the Respondent to claim an LAD figure at all.

9.15   As explained above, the tribunal has already awarded the contractor an EoT up to 12th May 2002. The question remains as to the period after 12th May 2002 – should any further EoT be granted?

9.16   A variety of events arose after 12th May 2002, some of which fall within Article 35.1 (d) (e) or (g) of the General Conditions of Contract (relating respectively to: the Contracting Authority's failure to fulfil its obligations under the Contract; any suspension of the Works not due to the contractor's default; and any other causes for delay not due to the contractor's default).[83]

9.17   For example, under Article 35.1(d), the tribunal finds that the MoW refused to accept part of the Works save until significant time elapsed and no deterioration of the road occurred. Once it was shown that the work was good it was incumbent upon the MoW to agree an EoT with the contractor.

9.18   In fact, the Respondent's failure to pay the contractor certified sums when due, even when these clearly accepted the Respondent's maximum entitlement to deduct LADs, its refusal to accept the Works and its instructions for additional Works when taken together provide ample justification for the contractor to have delayed the Works for reasons which were not its fault.

9.19   The significant shortfall of cash due is now apparent to the tribunal. Both Article 35.1 (d) and (e) apply here. On 9th March 2005, a belated "Provisional Acceptance Certificate" for road sections Km0-34 and KM43-43065 was issued adding *"This is to certify that Works for these road sections are accepted as Substantially Completed with effect from 22 August 2003"*. The tribunal is satisfied that the serious cash difficulties caused by the wrongful under-certifying and deductions of LAD had a delaying effect upon the Works probably down to 22nd August 2003.

---

[83]   Article 35 of the General Conditions is set out in full in section 3 above.

9.20    Then on 6th June 2005, it was certified that since 'Provisional Acceptance Certificates' were issued on 8th, 10th and 13th December 2004, then again on 28th January 2005, these sections were substantially completed on 28th January 2005.  It appears to the tribunal that the operation of the EoT machinery is handicapped by the Ministry's approach to the contract provisions and in any event the remaining Works down to 28th January 2005 were not only so minor in nature that the date is wrong but if not, the delay is caused by the financial difficulties created in the wake of wrongful deductions.  The tribunal extends time to 28th January 2005.

9.21    As to financial compensation for the Claimant for the period beyond 12th May 2002 down to 28th January 2005, we have been unconvinced by attempts to allocate monies for this time to the Claimant.  The EoT is therefore granted but without associated prolongation costs.

9.22    The tribunal wishes to add a comment, albeit that the point does not in fact arise. LADs are intended to reflect a genuine pre-estimate of the claiming party's losses suffered as a result of the contractor's delays. Here, the road was passable to traffic almost continuously throughout the Contract period and certainly for almost the entire period after the original completion date of May 2001.

9.23    It is therefore difficult to understand how the Employer's losses (such as they might be provable) in this case could possibly amount to 10% of the contract sum and so exceed the total amount of unpaid certified sums totalling €1.69 million.

9.24    Accordingly, in relation to the unpaid but certified sums, the tribunal awards the Claimant the full amount now sought (after the payment made in March 2006), though the tribunal awards the amounts due in accordance with the currency split claimable under the Contract.

9.25    According to the table set out in paragraph 6.7 of the G & T report, the total amount claimed is €1,691,757. However, that amount (a) is based on a conversion of all the Tsh elements into euros; and (b) ignores the payment made in March 2006 of €249,772.

9.26    The tribunal considers that the Claimant should be paid in accordance with its original certificates, i.e. Tshs 239,913,475 and €1,383,519[84], less the sum of €249,772.

9.27    After the original (uncorrected) Second Partial Award was transmitted to the parties, it was pointed out by Messrs Kesaria on behalf of the Claimant *inter alia* that Interim Certificate No 29 in the sum of Tshs 8,752,049 and €33,072 had been deducted in error and included in the original Appendix 13 to the Statement of Claim (and paragraph 6.7 of the G & T report) also in error. It was alleged that Interim Certificate No 29 had never in fact been processed.

9.28    According to the Claimant, the correct revised amounts should be Tshs 248,665,524 and €1,166,819.

9.29    By an email addressed to the tribunal and sent from Dr Wilbert Kapinga on behalf of the Respondent on 5 November 2009, it was agreed that the tribunal could take account of the fact that Interim Certificate was never processed and consented to the tribunal dealing with that and other errors by way of a corrected Award.

9.30    Accordingly, the tribunal awards the Claimant under this head the total sum of Tshs **248,665,524** ~~239,913,475~~ and €**1,166,819**~~1,133,747~~.

9.31    As to interest on the unpaid certificates, there can be no doubt that as a matter of equity and law that interest should be paid. However, the Claimant will have to submit a proper basis for calculating interest in terms of the two currency elements.

**ACCORDINGLY**

**WE, Anthony Bingham, Louis Flannery and Kesogukewele Msita**

**AWARD AND DIRECT as follows:**

---

[84]    The tribunal has adopted the figures taken in the G & T Report after having cross-checked with the original interim certificates.

1.      The tribunal hereby awards the Claimant its costs incurred in connection with the Preliminary Objections and the Partial Award (including the associated fees and expenses paid to the tribunal by the Claimant), such costs to be finally determined by the tribunal in its Final Award (which will dealing with all remaining issues concerning interest and costs) after receipt of the Claimant's updated costs schedule.

2.      In respect of the claims for extension of time (claims 1, 2 and 3) the tribunal awards the Claimant an extension of time of **twelve** (12) months and six days (i.e. up to 12th May 2002).

3.      In respect of the Claimant's monetary claims under the various heads, the tribunal awards the Claimant the total sums of ~~€8,618,474~~8,646,838.31 and ~~Tshs 2,255,419,748~~ Tshs 2,269,133,920349,470, made up of the following:

   (1)      In respect of the associated prolongation costs for the extension of time, the tribunal awards the Claimant the sum for the period from 6th May 2001 to 12th May 2002 (12.2 months) in the total combined sum of ~~€6,495,185~~€6,499,357.60 and **Tshs 1,719,944,778**.

   (2)      In respect of the claim for additional costs of €594,636 in respect of acceleration (claim 4) the tribunal awards the Claimant **€Nil**.

   (3)      In respect of the additional costs of €228,440 claimed in respect of Administrative Order No 1 (claim 5(a)), the tribunal awards the Claimant **€Nil**.

   (4)      In respect of the increased costs of €341,151 associated with Administrative Order no 2 (claim 5(b)) the tribunal awards the Claimant the sum of **Tshs 41,008,001**.

   (5)      In respect of the additional costs of pothole repairs (claim 6(a))~~ in the sum of €293,693~~, the tribunal awards the Claimant ~~€59,409~~50,409.27 and ~~Tshs 13,505,532~~ Tshs 13,339,958.

   (6)      In respect of the claim for ~~€607,396~~ reimbursement of the original carriageway costs between Km 30 and Km 34~~for additional traffic~~

- 62 -

maintenance and supervisory costs during the maintenance of diversions (claim 6(b)), the tribunal awards the sum of €185,109 €185,228.65 and Tshs 49,017,6232.

(7)     In respect of the claim for time related costs for maintenance of traffic and supervisor's laboratory facilities from 8th Nov 2001 to 22nd Aug 2003 the unpaid amount of construction of 3.55km between Km30 and Km34 (claim 7), the tribunal awards the Claimant €12,649.7950 and Tshs 3,347,390 Tshs 3,347,554.

(8)     In respect of the claim for €1,002,679 in respect of additional diesel fuel (claim 8), the tribunal awards the Claimant the sum of €732,374 and Tshs 188,682,950 Tshs 193,810,482.

(9)     In respect of the claim for costs of €6,892 for additional testing (first additional claim), the tribunal awards the Claimant the sum of €Nil.

(10)    In respect of the claim for €1,691,757 in respect of the Respondent's alleged failure to pay certified sums and withheld liquidated damages (claim 9) the tribunal awards the Claimant the sum of Tshs 239,913,475 248,665,524 and €1,166,8191,133,747.

(11)    In respect of the claim for interest and any claim for costs, including the determination of the costs awarded in respect of the Partial Award and the Preliminary Objections, the tribunal shall fix and determine these in its Final Award once it receives the parties' submissions on interest and costs.

**Seat of Arbitration:** Dar es Salaam, Tanzania

10 June 2009 10 December 2009

......................................
Anthony Bingham (President)

......................................
Louis Flannery

......................................
Kesogukewele M.I.M.Msita

- 63 -